No. 19-1348C

Judge Lerner

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

PETRINA SMITH,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION
FOR CONDITIONAL CERTIFICATION AND NOTICE

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

RAFIQUE O. ANDERSON
Trial Attorney
Commercial Litigation
Branch Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-3274

July 29, 2022                                    *Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

**Cases**                                                                       **Page**

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE ........................................................................ 1

STATEMENT OF THE ISSUES ................................................................................................ 3

STATEMENT OF THE CASE ................................................................................................... 3

FACTUAL BACKGROUND ..................................................................................................... 4

    I.     DEFENDANT'S MANAGEMENT STRUCTURE AND RETAIL OPERATIONS ............. 4

    II.     ACC JOB DESCRIPTION AND TRAINING ......................................................... 4

    III.     ACC MANAGEMENT DUTIES AND RESPONSIBILITIES ............................................ 5

    IV.     THE TESTIMONY OF DEFENDANT'S 30(B)(6) WITNESS ESTABLISHES THE EXISTENCE OF LAWFUL POLICIES ..................................................................... 9

    V.     THE NAMED PLAINTIFF AND HER EVIDENCE ......................................................... 10

        A.     Plaintiff Petrina Smith ........................................................................................ 11

        B.     Declarations Filed By Potential Plaintiffs ............................................................. 12

    VI.     ACCS TESTIFY REGARDING THE ACC MANAGEMENT ROLE AND RESPONSIBILITIES .............................................................................................. 13

    VII.     EXECUTIVE EXEMPTION TO OVERTIME PAY ......................................................... 14

    VIII.     MS. SMITH'S DISCOVERY ........................................................................... 17

    IX.     PROCEDURAL HISTORY ............................................................................... 18

SUMMARY OF THE ARGUMENT ........................................................................................ 19

ARGUMENT ........................................................................................................................... 22

    I.     MS. SMITH CANNOT ESTABLISH THAT SHE IS "SIMILARLY SITUATED" TO A NATIONWIDE Collective .............................................................................. 22

        A.     Legal Standard ................................................................................................... 23

        B.     Ms. Smith Has Failed To Submit Sufficient Evidence Of A Nationwide "Violation Of Law" 25

        C.     In The Absence Of A Common "Illegal" Plan Or Policy, Ms. Smith's Proposed Collective Should Be Rejected ......................................................................................... 38

        D.     Judicial Authority Does Not Support Ms. Smith's Request For A Collective Action ............. 39

    II.     THE FORMS OF NOTICE AND CONSENT PROPOSED BY PLAINTIFF IS IMPROPER AND INADEQUATE ......................................................................................... 44

        A.     Notice Should Be Limited To The Menlo Park And Palo Alto Canteens .............................. 44

        B.     Ms. Smith's Request For Information Other Than Potential Collective Members' Last Known Addresses Is Overbroad And Unnecessary ......................................................... 45

III.    Equitable Tolling does not apply...........................................................................46

    A.   Equitable Tolling Is Unavailable In FLSA Claims Against The Government ......................46

    B. Even If Equitable Tolling Could Apply, It Would Not Be Available For Ms. Smith's FLSA Claim ...................................................................................................................................48

IV.    THE COURT CORRECTLY STRUCK MS. SMITH'S FILING of notices of consent to join fOr POTENTIAL PLAINTIFFS ...................................................................................49

CONCLUSION ....................................................................................................................50

## TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page**

Ahmed v. T.J. Maxx Corp, No. 10-cv-3609 (ADS) (ETB) 2013 WL 2649544 (E.D.N.Y. June 8, 2013) 34

Anderson v. McCarthy, Burges & Wolff, Inc., No. 1:14–CV–617, 2015 WL 224936 (N.D. Ohio Jan. 15,
    2015) ...................................................................................................................................22

Bacon v. Eaton Aeroquip, LLC, No. 11–cv–14103, 2012 WL 6567603 (E.D. Mich. Dec. 17, 2012) ......22

Barry v. United States, 117 Fed. Cl. 518 (2014) ...........................................................................43

Berg v. United States, 49 Fed. Cl. 459 (2001) .............................................................................15

Bowman v. Crossmark, Inc., No. 09–cv–16, 2010 WL 2837519 (E.D. Tenn. July 19, 2010) ..................22

Brice v. Sec'y of the Dep't of Health and Human Servs., 240 F.3d 1367 (Fed. Cir. 2001) .......................48

Brown v. Barnes & Noble, Inc. ("Brown I"), 252 F. Supp. 3d 255 (S.D.N.Y. 2017)..................................43

Brown v. Barnes & Noble, Inc. ("Brown II"), No. 16-CV-7333 (RA) (KHP), 2018 WL 3105068,
    (S.D.N.Y. June 25, 2018) ................................................................................................... 16, 24

Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., Inc., No. 11-cv-8670 (JPO) (RLE), 2013 WL
    1285295 (S.D.N.Y. Mar. 29, 2013).......................................................................................16

Cooke v. General Dynamics Corp., 993 F.Supp. 56 (D. Conn. 1997)........................................................20

Cox v. Entm't U.S.A. of Cleveland, Inc., No. 1:13 CV 2656, 2014 WL 4302535 (N.D. Ohio Aug. 29,
    2014) ...................................................................................................................................21

Crawley v. United States, 145 Fed. Cl. 446 ...............................................................................48

Dalheim v. KDFW–TV, 918 F.2d 1220 (5th Cir. 1990)..............................................................20

Diaz v. Elecs. Boutique of Am., Inc., No. 04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17,
    2005) ...................................................................................................................................20

Doe No. 1 v. United States, 143 Fed. Cl. 113, 116 (2019).............................................................43

Donovan v. Burger King, 675 F.2d 516 (2d. Cir. 1982) ................................................................21, 30-31

Doyle v. United States, 20 Cl. Ct. 495 (1990) ......................................................................... 47, 48

Eng-Hatcher v. Sprint Nextel, Corp., 07-cv-7350 (BSJ)2009 U.S. Dist. LEXIS 127262 (S.D.N.Y. Nov. 13, 2009) ........................................................................................................................... 45

Gayle v. United States, 85 Fed. Cl. 72 (2008) ................................................................ 23, 24, 25

Gonyer v. Vane Line Bunkering, Inc., 32 F. Supp. 3d 514 (S.D.N.Y. 2014) ............................... 48

Guillen v. Marshalls of MA, Inc., 750 F. Supp. 2d 469 (S.D.N.Y. 2010) ................................... 34

Heitzenrater v. Officemax, Inc., No. 12-CV-900S, 2014 WL 448502 (W.D.N.Y. Feb. 4, 2014) ............. 44

Hoffman-LaRoche v. Sperling, 493 U.S. 165 (1989) .................................................... 38, 45, 49

Holt v. Rite Aid Corp., 33 F.Supp. 2d 1265 (M.D. Ala. 2004) ...................................................... 28

In Re Food Lion, Inc., 151 F.3d 1029 (4th Cir. 1998) ................................................................. 21

Indergit v. Rite Aid Crop, No. 08 Civ. 9361 (PGG), 08 Civ. 11364 (PGG), 2010 U.S. Dist. LEXIS 60202 (S.D.N.Y. June 15, 2010) ................................................................................... 35

Jibowu v. Target Corporation, 492 F. Supp. 3d 87 (E.D.N.Y. 2020) ............................... 33, 34, 44

John R. Sand & Gravel Co. v. United States, 552 U.S. 130 (2008) ............................................ 47

Jones v. United States, 88 Fed. Cl. 789 (2009) .......................................................................... 46

Jungkunz v. Schaeffer's Inv. Research Inc., No. 11-cv-00691 2014 WL 1302553 (S.D. Ohio Mar 31, 2014) ................................................................................................................................ 21

Kirkendall v. Dep't of Army, 479 F.3d 830 (Fed. Cir. 2007) ...................................................... 47

Korenblum v. Citigroup, Inc., 195 F. Supp. 3d 475 (S.D.N.Y. 2016) .................................... 24, 43

Lin v. Everyday Beauty Amore Inc., No. 18-CV-729 (BMC), 2018 WL 6492741 (E.D.N.Y. Dec. 10, 2018) ................................................................................................................................ 33

Martin v. United States, No. 13-CV-834C (PSC), 2015 WL 12791601, at *3 (Fed. Cl. Oct. 15, 2015) ... 48

Mason v. Lumber Liquidators, Inc., No. 17-CV-4780 (MKB) (RLM), 2019 WL 2088609 (E.D.N.Y. May 13, 2019) ........................................................................................................................43

McDermott v. Fed. Sav. Bank, 14-cv-6657 (JMA) (GRB) 2018 WL 1865916 (E.D.N.Y. Apr. 18, 2018) ............................................................................................................................................43

Meo v. Lane Bryant, Inc., No. 18-CV-6360 (JMA) (AKT), 2019 WL 5157024 (E.D.N.Y. Sept. 30, 2019) ....................................................................................................................................33

Meyer v. Panera Bread, 344 F. Supp. 3d 193 (D.D.C. 2018) ........................................... 41, 42

Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216 (D. Conn. 2003) ............................... 25, 28

Murray v. Stuckey's Inc., 939 F.2d 614 (8th Cir. 1991)...........................................................26

Neff v. U.S. Xpress, Inc., No. 10–cv–948, 2013 WL 4479078 (S.D. Ohio Aug. 20, 2013) ......................22

Pacheco v. Boar's Head Provisions Co., Inc., 671 F.Supp. 2d 957 (W.D. Mich. 2009) .............................22

Pendlebury v. Starbucks Coffee Co., 2005 WL 84500 (S.D. Fla. Jan. 3, 2005)...........................................41

Saleen v. Waste Mgmt., Inc., 649 F. Supp. 2d 937 (D. Minn. 2009) ........................................26

Scott v. SSP Am. Inc., 2011 WL 1204406 (E.D.N.Y. Mar 29, 2011) .......................................31

Servertson v. Phillips Beverage Co., 137 F.R.D. 264 (D. Minn. 1991) .......................................38

Sharma v. Burberry Ltd., 52 F. Supp. 3d 443 (E.D.N.Y. 2014) ........................................33

Sheffield v. Onus Corp., 211 F.R.D. 411 (D. Ore. 2002)........................................................39

Smith v. Heartland Auto. Servs., Inc., 404 F. Supp. 2d 1144 (D. Minn. 2005)...........................................26

Smith v. United States,  156 Fed. Cl. 471 (2021)...................................................................... passim

Soriano v. United States, 352 U.S. 270 (1957) .......................................................................46

Stevens v. HMSHost Corp., No. 10-CV-3571 (ILG) (VVP), 2021 WL 13098466 (E.D.N.Y. June 15, 2012) ................................................................................................................. 25, 42

Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496 (6th Cir. 2007) .................................30

United States v. Brockamp, 519 U.S. 347 (1997).................................................................. 47, 48

United States v. Sherwood, 312 U.S. 584 (1941) ................................................................46

Valte v. United States, 155 Fed. Cl. 561 (2021)....................................................... 24, 36, 45

Velazquez v. Costco Wholesale Corp. 603 F. App'x 854 (9th Cir. 2015) ..........................36

Waggoner v. U.S. Bancorp, 110 F. Supp. 3d 759 (N.D. Ohio 2015)........................... 38, 39

Whalen v. United States, 85 Fed. Cl. 380 (2009)...............................................................25

**Statutes**

29 U.S.C. § 204(f) ...............................................................................................................14

**Regulations**

5 C.F.R. § 541.104 ...............................................................................................................14

29 C.F.R. § 541 ....................................................................................................................15

29 C.F.R. § 541.100(a)(3)....................................................................................................17

29 C.F.R. § 541.100(a)(4)....................................................................................................17

29 C.F.R. § 541.102 .............................................................................................................20

29 C.F.R § 551.104 ...............................................................................15, 16, 26, 31, 36

29 C.F.R.§ 541.105 ............................................................................................................217

29 C.F.R. § 541.106(a).................................................................................................. 17, 29

29 C.F.R. § 541.106(b) .................................................................................................. 16, 21, 29

29 C.F.R. § 541.700(a).........................................................................................................15

29 C.F.R. § 541.700(b) ........................................................................................................16

29 C.F.R. § 541.700(c)................................................................................................. 16, 21, 29

69 Fed. Reg. 22122 (Apr. 23, 2004) ...................................................................................16

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PETRINA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-1348C |
| | ) | Judge Lerner |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE

Defendant, the United States, respectfully submits this opposition to plaintiff's opposition motion for conditional certification and notice (Pl. Mot.). ECF No. 55. We oppose conditional certification of a collective action to join plaintiffs who are "Assistant Chiefs employed Veterans Canteen Services (VCS) throughout the United States . . . ." Pl. Mot. at. 5. In her renewed motion, Ms. Smith cannot meet her burden of demonstrating that she is similarly situated to other Assistant Canteen Chiefs (ACC) with respect to a uniform policy that violates the Fair Labor Standards Act. Ms. Smith still cannot identify a common unlawful policy that rendered the Assistant Canteen Chief position non-exempt. Rather, her renewed motion focuses on many of the same generalized anecdotes about ACCs performing customer service and other allegedly non-managerial tasks, without any reference to a uniform policy that required them to perform those other tasks as primary duties, thereby rendering them misclassified.

Indeed, as with Ms. Smith's prior motion, she has failed to put forth evidence that demonstrates that she and the purported collective of all Assistant Canteen Chiefs were subject to a common policy or plan by the VCS that violated the law. Instead, Ms. Smith relies upon her declaration and the declarations of 12 additional declarants. The declarations, however, contain conclusory statements about only the declarant's individual personal experiences in performing some functions that might usually be

performed by non-exempt employees, while ignoring the other management duties in the job description that they performed on a daily basis. *See* ECF No. 25-3 (Petrina Smith Declaration (Pl. Decl.) p. 1-4, Richard Bartoni Declaration (Bartoni Decl.), ECF No. 55-1 at 68, ¶ 3; Mildred Cannary Declaration (Cannary Decl.), ECF No. 55-1 at 72, ¶ 3; Cherise Carter Declaration (Carter Decl.), ECF No. 55-1 at 75, ¶¶ 4-5; Stacy S. Conn Declaration (Conn. Decl.), ECF No. 55-1 at 78, ¶ 3; Kurt Davis Declaration (Davis Decl.), ECF No. 55-1 at 82, ¶¶3, 5; Han Do Declaration (Do Decl.), ECF No. 55-1 at 84, ¶ 3; Jeanette M. Little Declaration (Little Decl.), ECF No. 55-1 at 88, ¶ 3; Lourdes Quintero Declaration (Quintero Decl.), ECF No. 55-1 at 92, ¶ 3; Tonya White Declaration (White Decl.) ECF No. 55-1 at 100, ¶¶ 3-4; Susan Cacciagrani Declaration (Cacciagrani Decl.), *Id*. at 70, ¶ 3; Joanna Cooper Declaration (Cooper Decl.), ECF No. 55-1 at 80, ¶ 3; William McCague Declaration (McCague Decl.), ECF No. 55-1 at 90, ¶ 4; William B. Webb, Jr. Declaration (Webb, Jr. Decl.) ECF No. 55-1 at 97, ¶¶ 3-4, 10.

Moreover, the ACC job description, ECF No. 25-1 (ACC position description (ACC PD) p. 99-104; the deposition of defendant's FRCP 30(b)(6) witness Joseph Tober (Tober Dep.), ECF 25-1; the declaration testimony of nine ACCs and the Chief Executive Officer, ECF 26-1, Exhibits (Ex.) 1-10; along with Ms. Smith's performance evaluation (Pl. Perf. Eval), ECF 26-1, Exhibit 11; together demonstrate that Ms. Smith fails to demonstrate that VCS had a uniform policy that violated the FLSA.

We also oppose the forms of notice proposed by Ms. Smith because the request for nationwide contact information is unwarranted.  And we oppose Ms. Smith's request to toll the statute of limitations for declarants to join this action because tolling is not available, and if it were, Ms. Smith fails to present any facts that would justify the tolling of the statute of limitations in this case.  As with Ms. Smith's prior motion, we do not oppose the conditional certification of a collective action to join additional consenting plaintiffs who, at any time within three years prior to the date that they file with the Court their consent to join the action, were employed as ACCs at the Palo Alto, California, and Menlo Park, California

Canteens.  We also reserve the right to request to decertify any conditionally certified collective and to dismiss any joined party.

## STATEMENT OF THE ISSUES

1.  Whether Ms. Smith has shown that all ACCs were subject to a nationwide *de facto* illegal policy of misclassifying them as FLSA-exempt.

2.  Whether the Court should grant conditional certification of a collective in the absence of adequate evidence that ACCs are similarly situated.

3.  Whether the Court should toll the statute of limitations for potential plaintiffs.

4.  Whether the Court correctly struck potential plaintiffs' consent to join forms because they were not employed at the Palo Alto/Menlo Park canteen within three years prior to the filing of Ms. Smith's complaint on September 4, 2019

## STATEMENT OF THE CASE

Ms. Smith was formerly employed by VCS as an Assistant Canteen Chief at the Palo Alto and Menlo Park, California Canteens.  On September 4, 2019, Ms. Smith filed this action claiming that she worked more than 40 hours per week and is entitled to FLSA overtime compensation.  On June 4, 2021, Ms. Smith filed a motion for conditional certification of a collective comprising all ACCs employed by defendant by VCS within three years before she and collective action members file their consents to sue until present.  ECF No. 25 at 5.  On October 15, 2021, the Court denied Ms. Smith's motion because (1) of the "idiosyncratic nature of an ACC's job duties would require this Court to analyze the individual experiences of up to 600 employees at the decertification stage and Ms. Smith's case did not fit the "Court's definition of efficient"; and (2) equitable tolling of the statute would not be appropriate because Ms. Smith did not file a defective pleading during the statutory period, she was not induced or tricked by the defendant into allowing the deadline to pass, and did not suffer an injury that was inherently unknowable at the time the cause of action accrued.  *Smith v. United States*,  156 Fed. Cl. 471 (2021).

On December 22, 2021, March 29, 2022, March 31, 2022, April 1, 20221, and April 5, 2022, Ms. Smith filed notice of filing plaintiff consent forms that were stricken by the Court on April 5, 2022

because (1) the plaintiffs that sought to join the aciton were not employed at the Palo Alto/Menlo Park, California canteen as specified in the Court approved notice, and (2) the filings failed to comply with RCFC Appendix E, paragraph 19.  ECF No. 51.  On April 22, 2022, Ms. Smith filed the current motion, her renewed motion to conditionally certify a collective and approve notice.

## FACTUAL BACKGROUND

### I.   DEFENDANT'S MANAGEMENT STRUCTURE AND RETAIL OPERATIONS

VCS operates 211 Canteens in all 50 states and Puerto Rico.  James G. Leahy Declaration (Leahy Decl.), ECF No. 26, Ex. 1, ¶ 21.  Canteens ranked at levels one through five contain retail, café, and coffee operations.  *Id.* at ¶ 9.  Canteens ranked at levels six and seven may have a very limited retail, café, and/or coffee operation.  *Id.*  VCS divides the country into regions and employs corporate staff to support operations.  *Id.* at ¶ 8.  VCS maintains 14 regions.  *Id.* at ¶ 7.  Each region comprises between 10 to 20 Canteens.  In each region, a regional manager supports the CC (canteen chief) and ACCs.  *Id.* at ¶¶ 8-9.  Finally, each Canteen employs, depending upon a variety of operational factors, up to six ACCs.  Taylor Paino Declaration (Paino Decl.), ECF No. 26, Ex. 2, ¶ 7.

### II.   ACC JOB DESCRIPTION AND TRAINING

VCS maintains job descriptions for ACCs, which establish general guidelines regarding the managerial responsibilities that ACCs are expected to perform as their primary duty.  *Id.* at ¶ 15; ACC PD p. 99-102.  VCS employs ACCs who report to the CC.  Leahy Decl., ECF No. 26, Ex. 1 ¶ 11.  To clarify store management expectations, VCS creates guidelines that outline the duties of ACCs.  ECF 25-1, Ex. 6, ACC PD p. 99-104; Leahy Decl. *Id.*, ¶ 16.  ACCs "[m]anage[] the day-to-day operation of the retail store incorporating industry business practices, and internal operating procedures, standards, and policies of retail operations[.]"  *Id.*  Upon entry on duty, ACCs learn how VCS stores operate and receive guidance concerning management expectations.  *Id.* at ¶ 17.  During each ACC's performance review they are evaluated on their leadership and management skills, and by how they have contributed to the

success of the Canteen's operations.  *Id.* at ¶ 20; Plaintiff's Progress Review February 1, 2015, to January 31, 2016 (Progress Review), Ex. 11.

III.    ACC MANAGEMENT DUTIES AND RESPONSIBILITIES

Typically, Canteens will have as many as zero to six ACCs depending on the size and volume of the store.  Paino Decl., ECF No. 26, Ex. 2, ¶ 7; Cheryl Barrett Declaration (Barrett Decl.), ECF No. 26, Ex. 3, ¶ 8; Zenna Reed Declaration (Reed Decl.), ECF No. 26, Ex. 4, ¶ 8.  Reporting directly to the ACCs are hourly lead and non-lead employees.  Patrina Smith Employee Evaluation February 1, 2017, to January 31, 2018 (Smith Sup. Eval.), ECF No. 26, Ex. 10; Leahy Decl., Ex. 1, at ¶ 13; Paino Decl., ECF No. 26., Ex. 2, ¶ 7, Barrett Decl., ECF No. 26, Ex. 3, ¶ 8; Reed Decl., ECF No. 26, Ex. 4, ¶ 8.  There are different types of hourly employees within the Canteens including cooks, retail, coffee, and vending employees.  *Id.*  ACCs are responsible for evaluating the performance of the hourly lead and non-lead employees.  Smith Sup. Eval., ECF No. 26, Ex. 10; Leahy Decl., ECF No. 26, Ex. 1, at ¶ 19; Mark Antczak Declaration (Antczak Decl.), ECF No. 26, Ex. 5, ¶ 29; Cassie Darnell Declaration (Darnell Decl.), ECF No. 26, Ex. 6, ¶¶ 29, 32.

VCS expects all ACCs to manage their respective departments and hourly lead and non-lead employees as their primary duty.  ACC PD, ECF No. 25-1, Ex. 6, p. 99-102; Leahy Decl., ECF No. 26, Ex. 1, at ¶ 18; Mark Weaver Declaration (Weaver Decl.), ECF No. 26, Ex.7, ¶ 11; Seana R. Donovan Declaration (Donovan Decl.), ECF No. 26, Ex. 9, ¶ 11.  Those managerial functions include all of the duties conventionally associated with managing a team of employees, such as recruiting, interviewing and training new employees, and making recommendations regarding hiring, discipline and termination, planning and directing the work of hourly lead and non-lead employees, scheduling their hours of work, handling employee complaints, grievances, apportioning work, controlling the flow of merchandise, monitoring compliance with agency policy and procedures and legal compliance measures.  ACC PD

ECF No. 25-1, Ex. 6, p. 99-102; Leahy Decl., ECF No. 26, Ex. 1, ¶ 18; Weaver Decl., ECF No. 26, Ex. 7, ¶¶ 10-42.

Depending on their assigned role within each store, ACCs have varying responsibilities.  ACC PD ECF No. 25-1, Ex. 6, p. 99-101; Leahy Decl. ECF 26, Ex. 1, ¶ 22; Paino Decl., ECF No. 26, Ex. 1, ¶ 7 (two ACCs supervise café; one ACC supervises retail; one ACC supervises coffee; one ACC supervises administrative; and one ACC supervises receiving operations); Barrett Decl., ECF No. 26, Ex. 3, ¶ 10 (one ACC supervises retail, café, and administrative operations); Tashina Spaulding Declaration (Spaulding Decl.), ECF No. 26, Ex. 8, at 1 (two ACCs supervise the food and vending operations and the CC supervises the retail employees and operations).  Some ACCs are tasked with monitoring operational tasks, such as hourly lead and non-lead employee hiring, associate scheduling, and human resources. ACC PD ECF No. 25-1, Ex. 6, p. 102; Leahy Decl., ECF 26, Ex. 1, ¶ 22; Donovan Decl., ECF No. 26, Ex. 9, ¶ 23 (ACCs oversee all hiring at the Canteen); Paino Decl., ECF No. 26, Ex. 2, ¶ 24 (ACCs and CCs oversee hiring).  Some ACCs are responsible for overseeing certain departments including retail, food, or coffee operations.  Leahy Decl., ECF No. 26, Ex. 1, ¶ 22; Weaver Decl., ECF No. 26, Ex. 7, ¶ 10 (ACC primarily responsible for administrative operations); Darnell Decl., ECF No. 26, Ex. 1, ¶ 10 (ACC responsible primarily for café).  Some ACCs are responsible for multiple departments, for example, retail, food, or coffee operations, at the same time.  Pl. Motion 25-1, Ex. 8, p. 99-101; Leahy Decl., ECF No. 26, Ex. 1, ¶ 22; Antczak Decl., ECF No. 26, Ex. 5, ¶ 8 (two ACCs supervise all food, retail, coffee, and administrative operations); Barrett Decl., ECF No. 26, Ex. 3, ¶ 10 (ACC responsible for retail, café, vending, and administrative operations).  Each Canteen has distinct needs with regard to hourly employee supervision, merchandise presentation, and customer service.  Leahy Decl., ECF No. 26, Ex. 1, ¶ 25.

ACCs supervise varying numbers of hourly employees depending on their particular circumstances.  For example, Taylor Paino, a Coffee Operations ACC in Minneapolis, MN, supervises

one hourly lead and five to seven hourly employees; while the Food ACC had 20-25 direct reports, and the Retail ACC had 10-15 direct reports.  Paino Decl., ECF No. 26, Ex. 2, ¶ 7.  ACCs Cheryl Barrett and Zenna Reed supervise six and 27 employees, respectively.  Barrett Decl., ECF No. 26, Ex. 3, ¶ 7; Reed Decl., ECF No. 26, Ex. 4, ¶ 7.  The number of assigned hourly employees directly affects an ACC's workload and responsibilities because the more hourly employees an ACC supervises, the more time they must spend on directing work, training, evaluating, coaching, and counseling.  Leahy Decl., ECF No. 26, Ex. 1, ¶ 23.

An ACC's duties will also vary based on the store in which they work.  Unlike other retailers, VCS does not employ cookie cutter designs and its Canteens are in many ways different from one another.  ECF No. 26, ¶ 21.  Also, unlike other retailers, VCS relies upon its ACCs to act independently after considering Canteen specific factors to customize the selection and display of merchandise, food, and coffee in such a way as to maximize the sale of goods to meet the customer traffic and purchasing patterns of their Canteens.  *Id.*

In addition, the Canteens vary dramatically across the country in a variety of significant ways that directly affect operations, including the following:

- Store Volume: Annual sales volume of VCS Canteens varies dramatically.  Some Canteens have sales volumes below $100,000 while other Canteens exceed $3,000,000.

- Head Count: The number of hourly lead and non-lead employees varies dramatically depending on the size and sales volume of the Canteen at issue.  Some Canteens have as few as two hourly leads and non-lead employees, while other locations can have as many as 50 lead and non-lead employees.

- Store Location: Canteens vary dramatically in their location.  Some are in large city medical centers, while others are in very small rural locations.

- Size of Canteen:  Canteens vary in size.  Some have a maximum selling square footage which is less than 800 square feet while some locations can be more than 7,400 square feet.

- <u>Entrance and Point of Sale</u>:  Some Canteens have more than one entrance and many times more than one location for point of sale.

Leahy Decl., ECF No. 26, Ex. 1, at ¶ 21.  Although ACCs work one shift per day, generally most Canteens have a first shift that begins at 6:30 am until 2:30 pm with a second shift lasting from 2:30 pm until 6:00 pm.[1]  Also, the sales volume of each Canteen significantly affects how a Canteen operates, thus affecting an ACC's daily routine.  Sales volume dictates the number of hourly employees per store; the greater a Canteen's revenue, the higher the Canteen's labor budget and the more lead and non-lead employee hours are available.  *Id.* at ¶ 25.  Thus, two canteens that have similar square footage, can have different levels of hourly employees.  *Id.*  For example, the Milwaukee, Wisconsin, Canteen with a 3,400 square foot sales floor, generates annual revenue of approximately $2,500,000 with approximately 17 hourly employees, while the San Antonio, TX Canteen, with a 2,900 square foot sales floor, generates approximately $7,220,320 with 31 hourly employees.  Antczak Decl., Ex. 26*,* Ex. 5, ¶¶ 6-7; Reed Decl., Ex. 26*,* Ex. 4, ¶¶ 6-7.

Moreover, busier Canteens with higher customer traffic and sales volume require more customer service and inventory deliveries, which affect the amount of time ACCs spend supervising the delivery of customer service and the activities of hourly employees in process and moving merchandise, food, and coffee to customers.  As a result, depending upon the respective Canteen, and the respective ACC assignment, an ACC can spend a lot or very little time overseeing the hourly lead and non-lead employee who in turn oversees the delivery and processing of new merchandise.  Leahy Decl., ECF No. 26*,* Ex. 1,

---

[1]  The Minneapolis, MN Canteen has an opening shift from at 6:00 am until 2:30 pm, Paino Decl., ECF No. 26, Ex. 2, ¶ 12; with the closing shift of 8:00 am through 4:30 pm Monday through Friday.  ECF No. 26 at ¶ 21.  The Fort Wayne, IN Canteen has an opening shift from at 7:30 am until 4:00 pm, Barrett Decl., ECF No. 26, Ex. 3, ¶ 12; with the ACC closing the canteen at 4:30 pm Monday through Friday.  ECF No. 26 at ¶ 20.  The San Antonio, TX Canteen has an opening shift from at 6:00 am until 3:00 pm, Reed Decl., ECF No. 26, Ex. 4, ¶ 12; with the closing shift of 11:00 am through 7:30 pm Monday through Friday.  ECF No. 26 at ¶ 22.

at ¶ 26.  Finally, and most importantly, the personality and management style of the CC affects ACC responsibilities because each CC is empowered to supervise his/her Canteen in a unique fashion.  Thus, the result is that some Canteen mangers delegate more tasks to ACCs than others.  *Id.* at ¶ 27.

## IV.   THE TESTIMONY OF DEFENDANT'S 30(B)(6) WITNESS ESTABLISHES THE EXISTENCE OF LAWFUL POLICIES

Defendant's 30(b)(6) witnesses testified that–consistent with the lawful polices considered by the Court in the Original Motion–defendant expects ACCs to engage in managerial duties as their primary duty.  Indeed, ACCs have significant managerial authority, including, but not limited to (1) leading and managing non-exempt employees, Ex. Tober Dep. 37:1-8; Ex. 3 at DOJ046; (2) backfill for non-exempt employees during staff shortfalls, Tober Dep. 37:10-38:2; Ex. 3 at DOJ046-DOJ047; (3) directing the stocking of merchandise, Tober Dep. 39:10-40:04; Ex. 3 at DOJ048-DOJ049; (4) verify monetary deposit transactions, Tober Dep. 72:19-73:17; Ex. 3 at DOJ050-DOJ051; (5) conduct end of the month inventory and complete consolidated inventory summary form, Tober Dep. 82:1-83:4; 85:1-86.7; DOJ052-DOJ056; (6) overseeing the use of promotional funds, Tober 87:1-14; DOJ057; (7) supervising a variable amount of customer transactions, Tober Dep. 93:21-94:9; DOJ058-DOJ059 (8) oversight of the financial budgets for coffee, food, and retail, Tober Dep. 117:12-30; DOJ061; (9) contributes to the establishment of yearly goals involving the attainment of gross margin, revenue, net operating income, and minimizing operational expenses, Tober Dep. *Id.*; (10) directing staff charged with protecting and securing assets to include merchandise, Tober Dep. 118:1-6; DOJ062; (11) serving on national boards and committees to provide input on programs and strategies, Tober Dep. 118:7-13; *Id.*; (12) overseeing finances and staffing levels that affect customer service and internal security, Tober Dep. 134:9-21; DOJ063; (13) recruit non-exempt employees, Tober Dep. 159:21-160:1; (14) supervise direct reports, Tober Dep. 156:1-158:14; DOJ064-DOJ066; and (15) instructing non-exempt employees as to where merchandise should be placed on the sales floor, Tober Dep. 156:22-157:7; DOJ064-DOJ065.

Notably, Ms. Smith's and the declarants' allegations of performing allegedly non-managerial tasks as their primary duty, are *not* supported by the testimony of the corporate witness who addressed the applicable policies, procedures, and corporate expectations that apply to ACCs. The corporate witness testified that ACCs are always managers, but also perform tasks that are the primary duties of non-exempt employees as needed. *See e.g.* Tober 37:1-8; DOJ046. ("Q. Do assistant chiefs work alongside hourly non-exempt employees?" "A. I'm not sure what you mean by work alongside them. They work with them. They lead them. They direct them. They delegate duties and responsibilities and the distribution to work. They train them. They assist them where assistance may be needed but -- if that's what you mean."); Tober 37:15-38:2; DOJ046-DOJ047 ("Q: In the event of a staffing shortfall, is it possible that assistant chiefs would perform those duties? A:  Yeah. I would think that in the event of a significant staffing shortfall, that's possible. In the event of a national emergency where we're [] having people stay overnight to cook for the veterans and staff, that's possible. Even I have cooked. In terms of a reoccurring duty, no. I can tell you assistant managers make a heck of a lot of money. I'm not going to pay them 60-, $70,000 a year to flip hamburgers."); Tober Dep 96:7-12; DOJ060; ("[T]he canteen chief held overall responsibility for their operation. If a canteen chief fails to meet the grading criteria for their specific [canteen] they are subject to a demotion[.] That will not affect the canteen chief -- the assistant chief. The motivation for the canteen chief (CC), who is overall responsible for all of it, is to make sure that our assistant managers are executing their managerial and operational duties to ensure they meet financial and budgetary requirements for their respective area.")

## V.     THE NAMED PLAINTIFF AND HER EVIDENCE

Ms. Smith's additional evidence cited in support of her motion consists of declarations from 12 additional ACCs. Plaintiff's Motion (Pl. Mot.) ECF No. 55-1. Rather than support a different result, this

evidence demonstrates that defendant's polices are lawful and that Ms. Smith and the potential plaintiffs are not similarly situated to one another, let alone a nationwide collective.

    A.  <u>Plaintiff Petrina Smith</u>

Ms. Smith accepted employment as an ACC in September 2012 and concluded her employment in February 2019. Plaintiff's Declaration (Pl. Decl.) ECF No. 25-3 ¶ 2. Ms. Smith worked in the Palo Alto and Menlo Park, California Canteens.[2] *Id.* She was supervised by Maggie Baker, Kenny Ung, Kimberly Adams, and Jerica Simpson during her employment with VCS. Plaintiff's Complaint (Pl. Compl.) ECF No. 1 ¶ 29. The Canteen employed other ACCs who were supervised by the CC as well. Pl. Decl. ECF No. 25-3 ¶ 4.

Consistent with the VCS ACC job description, Ms. Smith understood that she was responsible for "operating the cash register, customer service at the counter", merchandising and the sales floor. *Id.* at ¶ 3. During February 2015 until early November 2015, Ms. Smith was responsible for all food and retail operations at the Palo Alto Canteen. Plaintiff's Progress Review (Pl. Progress Review), ECF No. 26, Ex. 11 at 104. While at the Palo Alto Canteen, Ms. Smith (1) reduced shrinkage loss by $5,700, (2) increased sales by 10.5 percent, and (3) increased net operating income to a positive 1.2 percent in 2015 from a negative 3.9 percent in 2014. *Id.* From early November 2015 until January 31, 2016, Ms. Smith's responsible for all operations of the Menlo Park Canteen, which resulted in (1) an increase of $242,000 in net operating income over expectation, and (2) total sales of $4,000,000 compared to $379,000 the previous fiscal year. *Id.*

Despite Ms. Smith's understanding of her responsibilities, she challenges her exempt status based upon her feeling that she "spent approximately ninety percent of [her] time performing . . . manual tasks and provide services to canteen customers." Pl. Decl. ECF No. 25-3 ¶ 3. Although "employed . . . as an

---

[2] The Palo Alto and Menlo Park Canteens are considered one Canteen. Pl. Progress Review, ECF No. 26, Ex. 11.

Assistant Chief" she claims that she spent only "approximat[ly] one to two hours per day on managerial tasks." *Id*. at ¶¶ 2-3. Ms. Smith blames her assignment of "performing manual, day-to-day tasks necessary to provide the canteen's food and retail products and services to their customers" for keeping her from accomplishing what she wanted to do as a manger. *Id*. at ¶ 7. Ms. Smith alleges that "during the course of [her] employment" she complained to her CCs and regional managers that she was performing non-managerial tasks, but nothing was done about her issue. *Id*. at ¶ 8. Ms. Smith alleges that she was not performing her duties as an ACC because of the way the CC manager ran the Canteen; "[m]ultiple managers told [her] that they worked long hours when they were an [ACC] and that it was expected by [CCs] and Regional Managers." *Id*.

   B. <u>Declarations Filed By Potential Plaintiffs</u>

   Ms. Smith's motion also attaches templated affidavits from eight former ACCs and four current employees. Each of the affidavits offer the same arguments in support of their claim that they were improperly considered exempt managerial employees during their tenure as ACCs. Although they understood that they were primarily responsible for supervising associates and store operations, they claim that their CCs or staffing shortages, or both, prevented them from exercising these duties. ECF No. 55-1 at 68, Bartoni Decl., ¶ 3; ECF No. 55-1 at 73, Cannary Decl., ¶ 3; Carter Decl., ECF No. 55-1 at 75, ¶¶ 4-5; Conn. Decl., ECF No. 55-1 at 78, ¶ 3; Davis Decl., ECF No. 55-1 at 82, ¶¶ 3, 5; Do Decl., ECF No. 55-1 at 84, ¶ 3; Little Decl., ECF No. 55-1 at 88, ¶ 3; Quintero Decl., ECF No. 55-1 at 92, ¶ 3; White Decl. ECF No. 55-1 at 100, ¶¶ 3-4; Cacciagrani Decl., ECF No. 55-1 at 70, ¶ 3; Cooper Decl., ECF No. 55-1 at 80, ¶ 3; McCague Decl., ECF No. 55-1 at 90, ¶ 4; Webb, Jr. Decl. ECF No. 55-1 at 97, ¶¶ 3-4, 10. Likewise, each of the declarants assert that they spent between 20 percent to 30 percent of their work day conducting management activities while performing cooking, cash register, and cleaning/sanitation activities, among other responsibilities, at different times throughout the work day. *Id.* Also, each of the declarants assert that they routinely work more than 40 hours per week and do not receive "overtime"

pay.  Bartoni Decl., ECF No. 55-1 at 69, ¶ 6; Cacciagrani Decl., Ex. _ ¶ 5; Cannary Decl., ECF No. 55-1

at 70-71, ¶¶ 5-6; Carter Decl., ECF No. 55-1 at 76, ¶¶ 6-8; Conn Decl., ECF No. 55-1 at 79, ¶¶ 5, 7;

Cooper Decl., ECF No. 55-1 at 81, ¶ 8; Davis Decl., ECF No. 55-1 at 82, ¶ 5; Do Decl., ECF No. 55-1 at

84, ¶ 5; Little Decl., ECF No. 55-1 at 88, ¶ 5; McCague Decl., ECF No. 55-1 at 91, ¶¶ 6-8; Quintero

Decl., ECF No. 55-1 at 93, ¶¶ 6, 9; Webb Jr. Decl., ECF No. 55-1 at 98, ¶¶ 5, 7; White Decl., ECF No.

55-1 at 101, ¶¶ 6, 9.

Finally, several declarants participated in various managerial-specific activities including (1)

participating in the hiring process,  Cannary Decl. ¶ 7; (2) participating in national call meetings,

Quintero Decl. , ¶8; (3) managing all operational concepts and participate in national call meetings, Webb

Decl. at ¶¶ 4, 8; (4) training teams on food safety/sanitation, help navigate the Canteen through the rigors

of the pandemic, have financial operating success, assisting with the change of the layout of the canteen,

mitigate losses and control operational costs, William McCague Performance Review, Ex. 1 at DOJ002,

DOJ010, DOJ016; and (5) providing leadership and resolving employee problems, Kurt Davis

Performance Review, Ex. 2, DOJ039-DOJ040.

## VI.   ACCS TESTIFY REGARDING THE ACC MANAGEMENT ROLE AND RESPONSIBILITIES

Notwithstanding Ms. Smith's declaration asserting that she and a few other ACCs did not

perform managerial functions as a majority of their workday, ACCs from across the country have

testified that they regularly engage in a host of managerial functions as described by the ACC position

description, and with the permission of an individual CC:  (1) recruiting and hiring (Paino Decl., ECF 26,

¶ 24; Reed Decl., ECF 26, Ex. 4, ¶ 25); (2) scheduling (Antczak Decl., ECF 26, Ex. 5, ¶¶ 18-21; Darnell

Decl., ECF 26, Ex. 6, ¶¶ 18-21); (3) evaluation of employees (Weaver Decl., ECF 26, Ex. 7, ¶¶ 29-33;

Donovan Decl., ECF 26, Ex. 9, ¶¶ 26-30); (4) employee discipline (Paino Decl., ECF 26, Ex. 2, ¶¶ 33-34;

Barrett Decl., ECF 26, Ex. 3, ¶¶ 31-32; (5) training (Barrett Decl., ECF 26, Ex. 3, ¶¶ 31-32; Reed Decl.,

ECF 26, Ex. 4, ¶¶ 26-28; (6) Tracking Canteen Performance (Paino Decl., ECF 26, Ex. 2, ¶¶ 37-40;

Weaver Decl., ECF 26, Ex. 7, ¶¶ 38-40; and (7) directing the completion of tasks that are the primary

duties of non-management employees (Paino Decl., ECF 26, Ex. 2, ¶¶ 44-46 (60 percent of day directing

hourly employees; 25 percent of day doing hands-on activities; 15 percent executing other managerial

duties); Barrett Decl., ECF 26, Ex. 3, ¶¶ 42-44 (25 percent of day directing hourly employees; 75 percent

of day executing other managerial duties); Reed Decl., ECF 26, Ex. 4, ¶¶ 45-47 (80-90 percent of day

directing hourly employees; remainder of day executing other managerial duties); Antczak Decl., ECF

26, Ex. 5, ¶¶ 45-47 (80-90 percent of day directing hourly employees; remainder of day executing other

managerial duties); Weaver Decl., ECF 26, Ex. 7, ¶¶ 38-40 (80-90 percent of day directing hourly

employees; remainder of day executing other managerial duties); Spaulding Decl., ECF 26, Ex. 8, at 4

(spends 10 to 15 minutes per day assisting with the cash register; remainder of day executing managerial

duties); Donovan Decl., ECF 26, Ex. 9, ¶¶ 43-47 (80-90 percent of day directing hourly employees;

remainder of day executing other managerial duties).

VII.    <u>EXECUTIVE EXEMPTION TO OVERTIME PAY</u>

  The Office of Personnel Management promulgates regulations to implement the FLSA as applied

to Federal employees.  29 U.S.C. § 204(f).  Pursuant to the implementing regulations, "an employee

whose primary duty is management" is exempt from the FLSA's overtime requirements.  5 C.F.R. §

551.205(a)   Under this regulations, an employee is exempt if (1) the employee's primary duty is

management of the enterprise, including, but not limited to, the employee customarily and regularly

directing the work of two or more other employees; and (2) the employee has the authority to hire or fire

other employees or whose suggestions and recommendations as to the hiring, firing, advancement,

promotion or any other change of status of other employees are given particular weight.  *Id.*

The second factor of the FLSA executive exemption test requires that an employee's "primary duty" be "management."  *Id.*.  The OPM regulations define "primary duty" as a "duty that constitutes the major part (over 50 percent) of an employee's work."  5 C.F.R. § 541.104.  Further,

> a duty constituting less than 50 percent of an employee's work (alternative primary duty) may be credited as the primary duty for exemption purposes provided that duty: (1) constitutes a substantial, regular part of the work assigned and performed; (2) is the reason for the existence of the position; and (3) is clearly exempt work in terms of the basic nature of the work, the frequency with which the employee must exercise discretion and independent judgment as discussed in § 551.206, and the significance of the decisions made.

5 C.F.R. § 551.104.  To aid in that analysis, the regulations provide a non-exhaustive list of activities that constitute "management":

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id*.  In determining whether an employee's primary duty is management, the regulations also explain that courts should consider factors including, but not limited to,

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a); *see also Mullins v. City of New York*, 653 F.3d 104, 107 (2d Cir. 2011) (an analogous case interpreting the Department of Labor regulations definition of "primary duty.  Although the amount of time that an employee spends performing managerial work does not alone determine whether such

work is their primary duty, *see Paganas v. Total Maint. Sol., LLC*, 726 F. App'x 851, 853–54 (2d Cir. 2018) (summary order), the Second Circuit interpreted that the Department of Labor FLSA executive exemption applies to "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."

Furthermore, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b); § 551.104; *see Berg v. United* States, 49 Fed. Cl. 459, n.3 (2001); *see also Carhuapoma v. N.Y.-Presbyterian Healthcare Sys., Inc.*, No. 11-cv-8670 (JPO) (RLE), 2013 WL 1285295, at *9 (S.D.N.Y. Mar. 29, 2013) (recognizing that, under analogous DOL regulations, exempt executives have discretion in deciding when to perform non-managerial duties).

Because the Office of Personnel Management regulations do not have a specific reference to the managerial responsibilities of an assistant manager, we look to the Department of Labor regulations for guidance. Specifically, the DOL regulations specifically address the exempt classification of "assistant managers in a retail establishment," who "may have management as their primary duty even if [they] spend more than 50 percent of the time performing nonexempt work such as running the cash register[]" and nonetheless be properly classified as exempt. 29 C.F.R. § 541.700(c); 29 C.F.R. § 541.106(b) ("An assistant manager can supervise employees and serve customers at the same time without losing the exemption."); *see also* 69 Fed. Reg. 22122 (Apr. 23, 2004) (codified at 29 C.F.R. § 541) (discussing the exempt status of assistant mangers in the retail context who spend the majority of their time on nonexempt work); *Brown v. Barnes & Noble, Inc. ("Brown II")*, No. 16-cv-7333 (RA) (KHP), 2018 WL 3105068, at *10 (S.D.N.Y. June 25, 2018) ("generally, exempt executives make the decision regarding when to perform non-exempt duties and the success or failure of the business operations under their management while performing non-exempt work") When an employee performs concurrent duties,

"[w]hether an employee meets the requirements" of the exemption is determined on a case-by-case basis. 29 C.F.R. § 541.106(a).

Under the third requirement of the executive exemption test, an employer must establish that the employee "customarily and regularly direct[ed] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). The fourth requirement of the executive exemption test addresses whether an employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). In evaluating this requirement, the DOL regulations suggest that a court consider:

> whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105.

## VIII.   MS. SMITH'S DISCOVERY

After Ms. Smith filed her complaint on September 4, 2019, the parties engaged in extensive discovery. Defendant produced more than 4,600 documents, including all VCS operational policies, daily and hourly time and attendance documents for 71 ACCs for a three-year time frame, and employee personnel documents in response to Ms. Smith's propounding of 25 interrogatories and 37 requests for production. Additionally, defendant produced for deposition the recently retired former chief executive officer of the VCS as a Rule 30(b)(6) witness, and the VCS's former labor and employment director. The depositions lasted more than 9 hours and included topics involving employee classification, ACC job descriptions, the variation of ACC job duties at individual Canteens, and operational policies.

17

IX.   <u>PROCEDURAL HISTORY</u>

On September 4, 2019, Ms. Smith filed this action, alleging on behalf of herself and a putative collective of hundreds of ACCs nationwide, that defendant misclassified ACCs as exempt and erroneously denied FLSA overtime compensation.  *See Smith v. United* States, 19-cv-1348, ECF No. 1. On June 4, 2021, after engaging in pre-conditional certification discovery and with no outstanding discovery issues between the parties, Ms. Smith moved to conditionally certify a collective action, pursuant to Section 216(b) of the FLSA, consisting of all ACCs employed with the VCS during the preceding three years.  *Id.*

In opposition to Ms. Smith's certification motion, defendant submitted a contrasting record, including declarations from currently serving ACCs, and the chief executive officer of the VCS, who had a very different view of the duties and responsibilities of ACCs.  *See* ECF No. 26, Exs. 1-9.  Based upon the testimony and declarations submitted by plaintiff, there was no basis to infer that defendant implemented a nationwide policy or practice that resulted in wage and hour violations by "requiring" ACCs to primarily engage in non-managerial work, notwithstanding the corporate policies, training materials, evaluation tools, and job descriptions which contemplated managerial responsibilities.  *Id.*

In deciding Ms. Smith's motion, the Court found that, although conditional certification requires a "minimal showing", Ms. Smith failed to show that she was similarly situated to all other ACCs with respect to the claim that she was required to perform non-managerial job duties in contravention of the formal job description.  *Smith v. United States,* 19-cv-134, Memorandum Opinion (Mem. Op.) at 12, ECF No. 33.  Likewise, the Court denied Ms. Smith's request for equitable tolling of the statute of limitations because she was not "tricked by defendant's misconduct", the case did not suffer from defective pleading, nor did she suffer an injury that was inherently unknowable at the time the cause of action accrued.  *Id*. at 21-22.  Additionally, the Court concluded that in conditionally certifying the collective in the Palo

Alto/Menlo Park, California Canteen that Ms. Smith had not shown that telephone numbers and last known email addresses were necessary to provide adequate notice to potential collective action members because she had not shown why using last known mailing addresses was insufficient. *Id.* at 19-20. After due consideration, the court denied Ms. Smith's motion without prejudice. *Id.* at 23.

Despite no change in the case, other than the inclusion of 12 additional declarations that do not adequately explain the complexities of the ACC position or establish that all ACCs perform similar work, Ms. Smith again requests the Court to conditionally certify a *nationwide* collective of ACCs, excluding Palo Alto/Menlo Park, California, without identifying *any* policy requiring the performance of non-managerial tasks as a primary duty.

<u>SUMMARY OF THE ARGUMENT</u>

Despite having conducted extensive discovery in this matter, Ms. Smith has fallen well-short of meeting her burden for conditional certification. On the strength of 12 affidavits and a memorandum focused solely on the "modest" standard for collective action certifications, Ms. Smith requests extraordinary relief that would dramatically transform the scope and burden associated with this wage and hour dispute. Alleging "nationwide canteen operating policies and procedures", Pl. Mot. at 13; Ms. Smith, and the other declarants, claim to be "similarly situated" to other ACCs employed in more than 211 Canteens across 50 states and Puerto Rico. *Id.* at 15-19. After Ms. Smith's deposition of defendant's 30(b)(6) witness and labor and employment manager, and a close review of defendant's policies, including the ACC job description, the evidentiary record is clear: Ms. Smith does not base her statutory claim on VCS's "nationwide Canteen operating policies and procedures" at all, but rather on the individualized tasking of ACCs by individual CCs. Pl. Mot. at 12-13.

Specifically, Ms. Smith alleges that, despite defendant's "nationwide" policies and procedures, she and the other declarants spent approximately 70 percent to 90 percent of their time performing

"manual tasks" as directed by individual CCs.  Pl. Decl. ECF 25-3, ¶3 (emphasis added); Bartoni Decl., ECF 55-1 at 69, ¶ 7; Cannary Decl., ECF 55-1 at 72, ¶ 3; Carter Decl., ECF 55-1 at 76, ¶¶ 5; Conn. Decl., ECF 55-1 at 78, ¶ 3; Davis Decl., ECF 55-1 at 82, ¶ 3; Do Decl., ECF 55-1 at 84, ¶ 3; Little Decl., ECF 55-1 at 88, ¶ 3; Quintero Decl., ECF 55-1 at 92, ¶ 3; White Decl. ECF 55-1 at 100, ¶ 3; Cacciagrani Decl., ECF 55-1 at 70, ¶ 3; Cooper Decl., ECF 55-1 at 80, ¶ 3; McCague Decl., ECF 55-1 at 90, ¶ 4; Webb, Jr. Decl. ECF 55-1 at 97, ¶ 3.  In other words, although VCS's policies and procedures expressly contemplate an exclusively managerial role for ACCs, Ms. Smith argues that individual canteen chiefs directed her and the declarants to perform such supervisory functions in conjunction with performing tasks that are the primary duty of non-managerial staff on a canteen-by-canteen basis.  Thus, there is no uniform unlawful policy to tie together a nationwide collective of ACCs.

   Ms. Smith's invitation for this Court to consider the *individual* circumstances of a small percentage of ACCs also underscores the fundamental flaw in her request to certify a national collective. The Court should decline Ms. Smith's invitation because her proposed approach would inevitably result in individualized inquiries involving the unique circumstances of other ACCs.  Federal courts interpreting the United States Department of Labor regulations, which are non-binding to VCS ACCs, have concluded that "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing administrative duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities."  *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-cv-0840E(SR), 2005 WL 2654270, at *2 (W.D.N.Y. Oct. 17, 2005); *see* 29 C.F.R. § 541.102; *see Cooke v. General Dynamics Corp.*, 993 F.Supp. 56, 59 (D. Conn. 1997) ("Under the short test, the employee's 'primary duty' will usually be what he or she does that is of principal value to the employer, not the collateral tasks that he or she may also perform, even if they consume more than 50% of his or her time.") (*citing Dalheim v. KDFW–TV*, 918 F.2d 1220, 1227 (5th Cir. 1990).

Specifically in the retail sector, DOL has recognized in regulations that assistant managers may spend more than 50 percent of their time performing nonexempt work, such as running a register, and nonetheless be properly classified as exempt. *See* 29 C.F.R. § 541.700(c), § 541.106(b).  Thus, courts generally certify collective actions addressing the exempt status of retail assistant managers only when there is concrete evidence that assistant manager duties are consistent from store to store.  *In Re Food Lion, Inc.*, 151 F.3d 1029 (4th Cir. 1998)

The gravamen of Ms. Smith's argument is that when there is a corporate management structure that applies to all regions of the country, any single employee may plausibly assert that employees throughout the country are similarly situated with respect to that employee's day-to-day job activities even if those job activities contravene the company's stated requirements.  This is not so.  Providing information that VCS employed nationwide standardized policies and procedures and an identical hierarchical management structure has no bearing as to whether other ACCs were required to spend a majority of their time performing non-exempt tasks.  *See Donovan v. Burger King,* 675 F.2d 516, 521-22 (2d. Cir. 1982)

> We fully recognize that the economic genius of the Burger King enterprise lies in providing uniform products and service economically in many different locations and that adherence by Assistant Managers to a remarkably detailed routine is critical to commercial success . . . but judgments must still be made. In the competitive, low margin circumstances of this business, the wrong number of employees, too many or too few supplies on hand, delays in service, the preparation of food which must be thrown away, or an under directed or under supervised work force all can make the difference between commercial success and failure.

*Id.*  In this light, with respect to the extensive discovery completed in this case, the "modest plus" should apply when determining whether this case is "appropriate" for treatment as a collective action.  *See, e.g., Cox v. Entm't U.S.A. of Cleveland, Inc.,* No. 13-cv-2656, 2014 WL 4302535, at *2 (N.D. Ohio Aug. 29, 2014) (plaintiff had three months to conduct discovery); *Jungkunz v. Schaeffer's Inv. Rsch., Inc.*, No. 11-cv-00691, 2014 WL 1302553, at *7 (S.D. Ohio Mar. 31, 2014) (parties had agreement to limit initial

discovery to issue of similarly situated collective); *Anderson v. McCarthy, Burges & Wolff, Inc.,* No. 14–cv–617, 2015 WL 224936, at *4 (N.D. Ohio Jan. 15, 2015) ("Plaintiff had a substantial period of time to conduct discovery on the issue of conditional certification."); *Neff v. U.S. Xpress, Inc.,* No. 10–cv–948, 2013 WL 4479078, at *4 (S.D. Ohio Aug. 20, 2013) (parties were "provided the opportunity to conduct discovery on the issue of class certification"); *Bacon v. Eaton Aeroquip, LLC,* No. 11–cv–14103, 2012 WL 6567603, *3 (E.D. Mich. Dec. 17, 2012) ("Plaintiffs have engaged in at least four months of discovery."); *Bowman v. Crossmark, Inc.,* No. 09–cv–16, 2010 WL 2837519, at *4 (E.D. Tenn. July 19, 2010) (parties engaged in "considerable discovery directed toward conditional certification"); *Pacheco v. Boar's Head Provisions Co., Inc.,* 671 F.Supp.2d 957, 960 (W.D. Mich. 2009) (limited discovery "focused solely on the issue of certification").

Accordingly, Ms. Smith has fallen well short of meeting her burden to support her request for conditional certification of a broad nationwide collective.  In the absence of any evidence beyond 12 anecdotal declarations regarding individual work experiences at an extremely small percentage of operating Canteens, Ms. Smith has failed to meet her burden of proof, and thus her motion should be denied.

<u>ARGUMENT</u>

## I.   MS. SMITH CANNOT ESTABLISH THAT SHE IS "SIMILARLY SITUATED" TO A <u>NATIONWIDE COLLECTIVE</u>

Ms. Smith's attempt to identify agency policies that list the CC as the final authority for individual canteen operations does nothing to show that ACCs do not manage operations and staff as a primary duty.  Each of the declarants acknowledge that they conduct management activities on a daily basis.  Indeed, each declarant states that they conducted management activities for ten percent to thirty percent of their workday, and to the extent that those experiences differed from the alleged experiences of other declarants, the testimony reveals that the differences are attributable to the individual circumstances

of working in different canteens with different Canteen Chiefs, not an agency-wide policy. Because Ms. Smith and the other declarants are not similarly situated with regard to a *common* unlawful policy, the Court should recognize the absence of a broader collective of similarly situated ACCs and decline to conditionally certify the action.

A. Legal Standard

An employee may bring suit against his employer pursuant to the Fair Labor Standards Act (FLSA) "for and in behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). The FLSA does not specify a procedure for joinder of "similarly situated" plaintiffs. *See Gayle v. United States*, 85 Fed. Cl. 72, 77 (2008). However, most courts use a two-step approach. *Id*. The first step requires the original plaintiff to make a modest factual showing sufficient to demonstrate that she and potential plaintiffs together were victims of a common policy or plan that violated the law. *Id*. Plaintiffs can satisfy that evidentiary burden by showing that the pleadings, affidavits, and other available evidence support the conclusion that potential collective members are similarly situated. *Id*.[3]

If a plaintiff can satisfy the first step, the Court may conditionally certify a collective action and authorize notice to be sent to potentially similarly situated plaintiffs. *Id.* The second step occurs after the close of discovery. The defendant may move to decertify the collective action based on evidence developed during discovery. *Id.* If defendant requests decertification, the Court must determine whether the original plaintiff(s) and the plaintiffs who have consented to join the action in response to having

_____

[3] The only purpose for conditionally certifying a collective is to authorize sending court-approved notice to notify potentially similarly situated plaintiffs of the opportunity to join the action. Otherwise, recognizing the potential existence of a collective is meaningless because any FLSA action with more than one plaintiff is a collective action. If plaintiff does not desire to send court-approved notice to other potential plaintiffs, certifying the action as a collective is unnecessary and will not be requested.

received notice are sufficiently similarly situated to allow some or all of those plaintiffs who have joined in response to the notice to remain in the action.  *Id.*[4]

A "modest factual showing" requires a plaintiff "and potential plaintiffs together [to show that they] were victims of a common policy or plan that violates the law."  *Gayle*, 85 Fed. Cl. at 77; *see Korenblum v. Citigroup, Inc.,* 195 F. Supp. 3d 475, 479-480 (S.D.N.Y. 2016) (a modest factual showing requires "a shared unlawful policy; that is, while the proposed collective need not be 'identical in every possible respect,' its potential members must be similarly situated with respect to the allegedly unlawful policy or practice.")  Step one is intended to determine "whether to send court-approved notice to absent individuals who appear to be similarly situated to [] plaintiff[]."  *Valte v. United States*, 155 Fed. Cl. 561, 567 (2021).

In determining whether plaintiffs are "similarly situated" to members of a proposed collective, a plaintiff has to show "some identifiable factual or legal nexus [that] binds together the various claims of [potential opt-in plaintiffs] in a way that hearing claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA."  *Smith v. United States*, 156 Fed. Cl. at 479-80 (2021); *see Brown II,* 2018 WL 3105068, at *6 ("Courts generally require 'that there be a factual nexus between the claims of the named plaintiff and those who have chosen [or might potentially choose] to opt into the action.") (citations omitted).

Rather than rely on reasonable inferences, plaintiffs must provide actual evidence of a factual nexus between their situation and the persons they claim are similarly situated.  *Gayle*, 85 Fed. Cl. at 79. When a defendant has a common national policy, the sworn statements of additional plaintiffs throughout the country can be sufficient to establish this "factual nexus" for the purposes of conditionally certifying a

---

[4]  If defendant does not request to decertify the collective, no further action is necessary; the case proceeds as an FLSA collective action simply because more than one plaintiff has consented to join the action.

nationwide collective matter.  *See Stevens v. HMSHost Corp.,* No. 10-cv-3571 (ILG) (VVP), 2021 WL

13098466, at *5 (E.D.N.Y. June 15, 2012).

Also, when plaintiff seeks conditional certification for alleged misclassification claims based on

the actual tasks that were assigned at the worksite and not that the job description was unlawful, they must

persuade a court that "potential plaintiffs performed [non-managerial work as a primary duty] in

contravention of the facially valid nationwide polic[y]."  *Smith*, 156 Fed. Cl. at 480 (quoting *Mike v.

Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003); *Stevens,* 2012 WL 13098466, at *2

(stating that "a *de facto* [illegal] policy is demonstrated through a showing of the illegal application of a

common legal policy – *i.e.* that employees nationwide who, through classified as exempt, nevertheless

performed primarily non-exempt work.").  Finally, at step one, "the court does not resolve factual

disputes or make credibility determinations."  *Gayle*, 85 Fed. Cl. at 79;  *Whalen v. United States*, 85 Fed.

Cl. 380 (2009) ("[t]he court does not resolve factual disputes, decide substantive issues going to the

ultimate merits, or make credibility determinations at [step one].")

    B.  Ms. Smith Has Failed To Submit Sufficient Evidence Of A Nationwide "Violation Of Law"

        1.  Ms. Smith Attempts To Establish A Violation Of The FLSA Based Upon Treatment By Her Managers, Not VCS's Corporate Policies And Procedures

Ms. Smith has not met her burden to establish that VCS has committed a nationwide violation of

law.  Ms. Smith's fails to meet the established criteria for a collective action because her complaint and

motion fail to articulate whether she is challenging that VCS has an official unlawful policy or is

attempting to establish that there is a *de facto* unlawful policy that contravenes the ACC job description.

The thrust of Ms. Smith's argument is that she is similarly situated to ACCs throughout the VCS because

(1) ACCs were classified as exempt from the FLSA; (2) ACCs had a common job description; (3) VCS

used a common job posting for ACCs nationwide; and (4) ACCs were subject to the same payscale.  Pl.

Mot. 11-22; 26-29.  These facts do not establish that all ACCs are similarly situated with regard to the duties that they perform and whether they are properly classified as FLSA exempt.

Ms. Smith fails to offer any evidence or argument suggesting that VCS's official policies with respect to ACCs are unlawful.  Nor could she.  The ACC job description opens by stating plainly that an ACC's primary responsibility is to "manage the day-to-day operations" of the retail/food/vending store operations.  ACC PD, ECF No. 25-1 at 99-102; s*ee Murray v. Stuckey's Inc.*, 939 F.2d 614, 618 (8th Cir. 1991) (the court in interpreting Department of Labor regulation 29 C.F.R. § 541.103 concluded that "the person 'in charge' of a store [or department] has management as his primary duty even though [they] spend [] the majority of [their] time on [non-management tasks that would be a primary duty for hourly employees] and make[] few significant decisions.")

Additionally, the ACC job description further lists almost exclusively managerial tasks such as "directs the work of two or more employees"; "[i]nitiates cost-saving measures designed to enhance operational efficiency"; "appraise employees' productivity and efficiency for the purpose of recommending promotions"; plan the work [] determine the techniques to be used[,] apportion the work among employees [,] and will make recommendations on hiring and firing."  ACC PD, ECF no. 25-1 at 99-102; *Smith* 156 Fed. Cl. at 481 (a common job description and pay plan cannot support the conclusion that defendant violated the FLSA when the policies are facially lawful when applied to an employee performing management tasks as a primary duty as detailed in the ACC job description); *see Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) (concluding that use of the common job description is not appropriate evidence for the misclassification allegation based on actual workplace tasks because the job description set out mainly managerial tasks); *see also Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 940-41 (D. Minn. 2009) (denying conditional certification based upon

employer's policy of automatically deducting for meal breaks, when plaintiffs' theory of liability was premised upon managers' non-compliance with that otherwise lawful policy).

Similarly, Ms. Smith's references to VCS's policies and procedures do not establish a violation of law because these documents do not manifest any unlawfulness on their face and do not direct the performance of non-management tasks as a primary duty. Specifically, the policies and procedures refer to managerial tasks and leadership strategies. ACC PD, ECF No. 25-1 at 99-102. They also discuss and describe essential operational information of which a manager must be aware in order to effectively run the Canteen. *Id.* Nothing about the policies and procedures or its contents suggests that ACCs perform non-management tasks as a primary duty. In fact, the policies and procedures include a summary of management responsibilities, all of which are of a managerial nature. ECF No. 25-2, Ex. 13 p. 5-28. The simple fact that a company trains and provides policies and guidelines to new managers surely cannot compromise their exempt status. Indeed, without knowing company policies and procedures, a manager would be hard-pressed to implement and to enforce them. *See* 5 C.F.R. § 551.104 (management tasks as a primary duty include implementation of management policies and operating practices).

Conversely, if Ms. Smith is attempting to claim that she and other ACCs worked under a *de facto* unlawful policy because despite VCS's corporate policies and procedures her CC ordered her to perform primarily non-managerial work, then her argument fails in that regard as well. Specifically, Ms. Smith and the declarants argue that, despite what VCS expects and intends for its ACCs to do, their actual duties–as required by *their* CC and regional manager–place *them* outside the executive exemption. Ms. Smith's argument reveals that there is no common thread to tie together a nationwide claim of ACCs because proof of liability will not turn on VCS's policies or procedures applicable to the entire proposed collective, but rather, on evidence of what each potential plaintiff does on a daily basis as required by his or her CC/regional manager that is different than what is contained in the position description as a

primary duty.  *See Smith*, 156 Fed. Cl. at 483 (a *de facto* FLSA violation requires an individualized inquiry into the proportion of managerial work each plaintiff performed).

In *Holt v. Rite Aid Corp.*, the plaintiffs sought certification of a collective action consisting of store managers and assistant managers, alleging that they were similarly situated in that they were misclassified as exempt.  33 F.Supp. 2d 1265, 1270 (M.D. Ala. 2004).  Like Ms. Smith and the declarants, the plaintiffs claimed that, although their job descriptions contained exempt duties, they spent the majority of their time on nonexempt duties, such as running the cash register or cleaning and sanitation.  *Id.* at 1271; *See* Pl. Decl. ¶ 3.  In denying certification, the court explained:

> [T]his case is not a case where janitors are being classified as exempt executives.  Evidence before the court of the formal, written job descriptions of store managers and assistant store managers contains many managerial tasks.  It is only once the [p]lantiffs' testimony as to the degree to which other tasks are performed that the application of the exemption becomes questionable.  Therefore, . . . because the application of the executive exemption for merits purposes will require a fact intensive determination, it appears to the court that the similarly situated inquiry also requires an examination of day-to-day tasks.

*Id.*) (emphasis added).  Similarly, in *Mike v. Safeco Ins. Co. of Am.*, another misclassification case, the court denied certification of a collective action, concluding that a determination as to whether managers performed non-management tasks as a primary duty would require an individualized, fact-intensive analysis of that manager's job duties and responsibilities, *i.e.,* an *ad hoc* inquiry for each proposed plaintiff.  274 F. Supp. 2d 216, 220-21 (D. Conn. 2003).  Also, this Court concluded that "a shared common job description could 'not provide the necessary common thread' because plaintiff disavowed the job description."  *Smith v. United States*, 156 Fed. Cl. at 481 (citing *Mike*, 274 F. Supp. 2d at 221.).

In this case, other ACCs employed in other canteens around the country have testified that they performed their managerial duties in a manner consistent with VCS's expectations.  ECF No. 26, Exs. 2-10.  Ms. Smith and the declarants cannot establish that VCS violated the FLSA on a nationwide basis by pointing to "VCS operating procedures and policies", and by relying upon personal declarations

regarding their own individual experiences to prove a claim for nationwide certification of a collective action.

In any event, Ms. Smith, and the declarants' focus on the agency's operational policies and their alleged performance of non-managerial tasks, *while* they performed managerial duties activities, misses the point. As this Court instructed with its initial opinion in this case, there is a critical distinction between a corporate policy that *actively precludes* ACCs from managing *while* instructing them *only* to perform non-management tasks as a primary duty, and an individual canteen chief *instructing* an ACC to manage *while* completing non-management tasks as a primary duty. *Smith*, 156 Fed. Cl. at 483. Indeed, Ms. Smith still fails to explain how the agency's corporate polices relate to her claim that ACCs primarily perform non-management tasks as a primary duty in contravention of the ACC job description. *See id*. Conversely, Ms. Smith, and the declarants, *affirmatively* state that they routinely conduct management activities and fail to provide any information that there was a policy that *required* them to conduct non-managerial tasks *as a primary duty*. ECF No. 55-1 at 68-102. In other words, Ms. Smith and the declarants are unable to identify a *single policy* that required them to *not* manage as a primary duty so that they can devote their time to performing non-management tasks as a primary duty.

### 2. The Declarations Of The 12 Declarants Amplifies The Absence Of A Uniform Agency Policy That Would Render the ACC Position Non-exempt

Determining whether an assistant manager is exempt from the FLSA's overtime requirements is inherently a highly fact intensive inquiry that must be made on a case-by-case basis in light of the totality of the circumstances. *See* 5 C.F.R. § 551.205(a); *see also* 29 C.F.R. § 541.700(c) (an assistant manager "may have management as their primary duty even if [they] spend more than 50 percent of the time performing non-exempt work such as running the cash register[]" and nonetheless be properly classified as exempt.); 29 C.F.R. § 541.106(b) ("An assistant manager can supervise employees and serve customers at the same time without losing the exemption."); 29 C.F.R. § 106(a) (When an employee

performs concurrent duties, "[w]hether an employee meets the requirements" of the exemption is determined on a case-by-case basis.); *see also* Pay Administration Under the Federal Labor Standards Act, 72 FR 52753-01, 52757 (factors determine whether an employee qualifies for the executive exemption).  The record evidence confirms as much, revealing vast disparities in the experiences of the declarants with no prevailing uniformity that would support "similarly situated" and conditional certification.  *See* ECF Nos. 25-3; 55-1 at 68-102; *cf* ECF No. 26 Exs. 1-9. The declarants' main contention is that they allegedly spent a significant percentage of their time on non-management tasks that are the primary duty of non-management employees, such as customer service.  ECF No. 55-1 at 68-102.

However, as explained above, in a retail setting, an employer may properly classify as exempt a manager who spends a majority of their time assisting customers and performing other management tasks while performing tasks that are the primary duty of non-management employees, such as "running the cash register," as long as they are also responsible for exercising discretion and independent judgment such as supervising employees an ordering merchandise.  72 FR 52753-01, 52759.  In fact, courts have consistently held that citing to a high percentage of customer-focused and other tasks has little relevance in the retail management setting when such duties are often performed simultaneously with supervisory duties.  "While some employees covered by the executive exemption may not perform each and every activity listed under 'management'; there is an expectation that they will perform the function listed under 5 C.F.R. 551.205(a).  72 FR 52753-01, 52757; *see Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 504 (6th Cir. 2007) ("More importantly, however, the time factor is less momentous, and might even be somewhat misleading, where the employee's management and non-management functions are not clearly severable . . . where an employee manages while at the same time performing non-exempt tasks normally assigned to subordinate employees [] we refuse to give undue weight to the time factor of the 'primary duty' inquiry" (internal citations, quotations and alterations omitted)); *Donovan*, 675 F.2d at 521

(because, among other things, "much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial").

In such cases–especially in the retail setting–courts focus on whether the job at issue is primarily one of managing. *See, e.g., Donovan*, 675 F.2d at 521; *Scott v. SSP Am. Inc.*, 2011 WL 1204406, *6; *see also* 5 C.F.R. § 551.104. To answer this question, Federal courts examine evidence concerning, for example, the assistant manager's role in (1) delegating work, (2) training employees, (3) interviewing job applicants, (4) making personnel decisions, (5) discipling employees, (6) creating work schedules, and (7) making business decisions. 5 C.F.R. § 551.104; 551.205 (the executive exemption applies when "supervision cuts across product and service lines in terms of assessing activities and advising top management on business operations [even] when the supervisor or leader does not have the operational authority over all employees.) Defendant has produced a robust record concerning the ACC prescribed duties; whereas, the declarants have produced sparse information regarding their alleged responsibilities and provide little assistance in determining whether they are similarly situated to each other or to Ms. Smith. *See* Exs. ECF No. 55-1.

Further, the information provided indicates that ACCs are performing management activities *as a primary duty*, exactly as prescribed in their job descriptions. Thus, when read together with defendant's ACC declarations, ECF No. 26, Exs. 1-9, the declarants' allegations demonstrate a lack of a uniform policy negating their primary management duty. Indeed, some of the management examples include (1) Cannary participates in the hiring process, ECF No. 55-1, ¶ 7; (2) Quintero participates in national call meetings, ECF No. 55-1 at 93, ¶ 8; (3) Webb manages all operational concepts and participates in national call meetings, ECF No. 55-1 at 97-98, ¶¶ 4, 8; (4) McCague trains teams on food safety/sanitation and assists with the change of canteen layout, and mitigates loss/controlled costs, Ex. 1 at

DOJ002, DOJ010, DOJ016; and (5) Davis:  his evaluation included a review on the followiong

management accomplishments:

> Kurt, thank you for your leadership this past year. You have had to rebuild your
> entire staff, without any help- hats off to you. Thanks for your leadership skills of
> being calm, taking one job on at a time and teaching them well. You take the time to
> listen toyour customers' needs and to help in any way possible. Thank you for
> teaching all your staff to be customer focused first and foremost. By taking time to
> listen and being engaged with the customer, they will continue to shop with us.
>
> Empowering you[r] team is one of the most important aspects of what we do. By
> doing this they buy into what we are trying to do from CO down- Thank You. You
> have built your power wheel in Fayetteville, continue to work it. Dan Fields is a big
> advocate of the canteen, keep that relationship going in the right direction. You have
> also built great relations with just about all the service chiefs in your MC- this is
> huge. Thanks for the big up in your AES scores in Data Sharing, you jumped up
> 10%. In Usage you stay the same. Continue to talk about Data Sharing and Usage in
> you daily huddle meetings. With rebuilding a team comes training, and you have
> done a great job in food and retail. Thank you for following up and customer
> service, receiving and sanitation, by far the three most import components of a great
> operation. Thank you for understanding the cause and effect of the financials. With
> all that has happened in the last 6 months, my hat is off to you and your leadership
> style. Also, thanks for staying on top of all training for yourself. you are a continuous
> learner.

Ex. 2, DOJ039.  When reviewing the duties raised by the declarants, and evaluated by VCS supervisory

personnel, the declarants cannot demonstrate an "identifiable factual nexus" that binds Ms. Smith and the

declarants together as victims of a nationwide policy that has them performing non-management tasks as

a primary duty.  Thus, conditional certification should be denied.  *See Smith*, 156 Fed. Cl. at 483 ("The

idiosyncratic nature of ACCs' job duties would require this Court to analyze the individual experiences of

up to 600 employees at the decertification stage.  This does not fit the court's definition of efficient.")

### 3. Ms. Smith Fails To Provide Any Evidence That She Is Similarly Situated To More Than 600 Other ACCs Throughout The United States And Puerto Rico

Ms. Smith's request for a nationwide collective fails because she relies on only 12 declarations as

a allegedly representative of the duties and responsibilities of more than 600 ACCs nationwide.  Pl. Mot.

8-14.  Courts have concluded that submission of declarations purportedly demonstrating defendant's

unlawful unofficial policies, in only some of defendant's many locations, is insufficient to show a *de facto* nationwide policy of misclassification in violation of the FLSA. *See, e.g.*, *Meo v. Lane Bryant, Inc.*, No. 18-cv-6360 (JMA) (AKT), 2019 WL 5157024, at *10 (E.D.N.Y. Sept. 30, 2019) (denying conditional certification of a nationwide collective when potential plaintiffs worked in or had knowledge of similarly situated employees in defendant's stores in only twelve states though defendant operated 727 stores across forty-seven states); *Jibowu*, 492 F. Supp. 3d 87, 125 (E.D.N.Y. 2020) (finding that the declarations of the eight joined laintiffs were insufficient to show that they are, in fact, similarly situated to the potential members of the proposed nationwide collective of more than 14,000 Target employees); *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 460 (E.D.N.Y. 2014) ("Rather than rely on reasonable inferences, plaintiffs must provide actual evidence of a factual nexus between their situation and the persons they claim are similarly situated." (internal quotations, alterations, and citation omitted)); *see also Lin v. Everyday Beauty Amore Inc.*, No. 18-cv-729 (BMC), 2018 WL 6492741, at *3 (E.D.N.Y. Dec. 10, 2018) (finding that "when plaintiffs do not state any facts as to the existence of a common policy or practice of underpayment at other store locations[,] a collective action should not include those stores ... where store locations exist[ ] nationwide" (collecting cases)); *Costello v. Kohl's Illinois, Inc.*, No. 13-cv-1359 (GHW) 2014 WL 4377931, at *6 (S.D.N.Y. Sept. 24, 2014) (rejecting plaintiffs' argument that the fact that they had presented evidence from assistant store managers in more than 3 states "mandated" conditional certification, observing that "the probity of drawing ... an inference [of a common illegal policy or plan] will turn in part on the number of plaintiffs from whom the Court has evidence compared to the size of the pool of potential opt-in plaintiffs.")

Finally, because Ms. Smith's and the declarants' performance of management tasks as a primary duty is directed by the alleged practices of their individual CCs, their *local* management team, their anecdotal experiences are not represenative of hundreds of other ACCs working in other canteens of

varying sizes, with varying services and volume of customers and sales, and different CCs. *CF* ECF 26, Ex. 1-9; *see Smith*, 156 Fed. Cl. at 480 ("A formal policy of classifying employees hired under the same job title as exempt does not, on it own, provide the necessary evidence for certifying a collective action under the FLSA."). To that end, any misclassfication due to variation in unofficial *de facto* policies implemented at an individual canteen weighs against conditional certification of a nationwide collective. *Id.* at 481 ("Plaintiffs must show that they and other[s] were similarly situated *with respect to the claim that they were required* to perfom non-managerial [tasks as a primary duty] in contravention of the formal job description." (emphasis added) (citing *Jibowu*, 492 F. Supp. 3d at 125)) ; *see Ahmed v. T.J. Maxx Crop,* No. 10-cv-3609 (ADS) (ETB) 2013 WL 2649544  at *14 (E.D.N.Y. June 8, 2013).

> Thus, because 'there may be vast differences in the practices of individual stores across the country,' the Court finds that the Plaintiffs' evidence is 'extremely thin' with respect to the existence of a nationwide *de facto* illegal policy so that conditional certification is simply not appropriate.

(quoting *Guillen I*, 750 F. Supp. 2d at 476–78)). Consequently, because Ms. Smith has argued that there is substantial localized variation with respect to practices in defendant's stores, and has addressed the discretion afforded to local managers at those stores, she directly cuts against the need for a collective group of plaintiffs because each individual situation will involve a detailed review of each ACC's work responsibilities.

### 4. Dissimilar Employment Settings Within VCS Canteens Also Would Compel Individualized Inquiry

ACC job duties differ on the most basic level:  managerial assignment.  Each canteen, outside of having a CC, has a varying number of ACCs, and a varying number of assignments for an assigned ACC. Thus, in some canteens, ACCs have unique responsibilities (Antczak Decl., ECF No. 26, Ex. 5, ¶ 10), and in other stores, one ACC may have responsibility for multiple departments (Barrett Decl., *Id.*, Ex. 3, ¶ 10), have a primary and secondary responsibility (Reed Decl., *Id.,* Ex. 4, ¶ 10), or no ACC may be assigned to the Canteen at all (Mark Houtchen Declaration (Houtchen Decl.), *Id.,* Ex. 12, ¶ 8. Thus, based on area of

assignment, ACCs will have varying degrees of responsibility with regard to hourly worker supervision, administrative duties, and operational responsibility of the facility.

Even ACCs with similar assignments have different day-to-day duties based on the canteen in which they work and direction from the CC.  Contrary to *Indergit v. Rite Aid Crop*, No. 08 Civ. 9361 (PGG), 08 Civ. 11364 (PGG), 2010 U.S. Dist. LEXIS 60202 (S.D.N.Y. June 15, 2010), with store operations standardized and planograms (same sized stores) were used, VCS does not use "planograms" and Canteens are different from each other in many ways.  Leahy Decl., Ex. 1, ¶ 21.  At VCS, ACCs are expected to act as merchants who use their canteen specific knowledge of their customers and employees to manage key departments to drive revenue for each Canteen.  *Id.*

For example, Canteen sales volume significantly affects operations, and thus, affects an ACC's daily routine.  The greater a Canteen's revenue, the higher the canteen's labor budget and the more hourly associate hours available.  Leahy Decl., ECF No. 26, Ex. 1, ¶ 25.  As a result, canteens with high sales volume have far more hourly employees to supervise and to direct.  (Antczak Decl., ECF No. 26, Ex. 2, ¶¶ 6-7 ($2,500,000 annual revenue and approximately 17 hourly employees)); (Reed Decl., ECF No. 26, Ex. 4, ¶¶ 6-7 ($7,220,320 annual revenue and 31 hourly employees)).

Moreover, busier canteens with higher customer traffic and sales volume require more customer service and inventory deliveries, which affect the amount of time ACCs can spend on other tasks.  Each ACC also supervises a different number of employees depending upon his or her particular circumstances; for example, though both oversee retail, food, vending and administrative operations, Cheryl Barrett supervises six hourly employees and Zenna Reed supervises 31 employees.  Barrett Decl., *Id.,* Ex. 3, ¶¶ 7, 10; Reed Decl., *Id.,* Ex. 4, ¶¶ 7, 10.  The more hourly employees an ACC supervises, the more time he or she must spend directing work, training, evaluating, coaching, and counseling.  Leahy Decl., *Id.,* Ex. 1, ¶ 23.

Other store-specific factors that affect ACC responsibilities include the personality and management style of the CC. Each CC runs his or her store differently. Antczak Decl., *Id.,* Ex. 5, ¶ 43 (meets with the CC on a daily basis); Spaulding Decl., *Id.,* Ex. 8, at 4 (meets with the CC on a weekly basis). Indeed, various ACCs attest that their store manager affords wide latitude to make managerial decisions. Paino Decl., *Id.,* Ex. 2, ¶¶ 39, 40, 42, 43 (responsible for monitoring Canteen sales/product waste when making financial decision; solely responsible for product order; does not need CC approval to order products); Barrett Decl., *Id.,* Ex. 3, ¶¶ 33, 36, 39 (final authority for resolving customer complaints; responsible for profit/loss of the Canteen; solely responsible for the ordering of all merchandise); Reed Decl., *Id.,* Ex. 4, ¶ 25 (ACCs responsible for hiring and selecting candidates for interview). Others have CCs that do not delegate all managerial tasks listed in the position description. Reed Decl., *Id.,* Ex. 4, ¶ 25 (ACCs conduct performance reviews for probationary employees); Antczak Decl., *Id.,* Ex. 5, ¶ 32 (ACCs do not conduct performance reviews for probationary employees).

VCS's potential defenses are individualized as well. As detailed above, ACCs have many management responsibilities, all of which fall within the executive exemption. *See,* above, sections II ACC Job Description and Training; III ACC Management Duties and Responsibilities. To the extent that a particular ACC claims that he or she does not predominantly perform managerial tasks as a primary duty, VCS might show that allegation is not accurate or that the ACC is not fulfilling job expectations, which can be demonstrated through direct questions and reference to the particular ACC's personnel documents, such as job evaluations and counseling. For example, counseling and discipline of an ACC may show that an ACC who performs tasks that are the primary duty of non-management employees is not meeting the expectations of the job because management is the primary duty of the job. ACC PD ECF No. 25-1, Ex. 6, p. 99-102; Leahy Decl., ECF 26, Ex.1, ¶ 18; 5 C.F.R. § 551.104. In *Velazquez v. Costco Wholesale Corp.*, the Ninth Circuit concluded:

36

> [a] court cannot determine whether an employee primarily engaged in exempt managerial duties based solely on the 'number of hours that the employer, according to its job description or its estimate, claims the employee should be working.' If it did 'then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality'. Similarly, a court cannot solely rely on an employee's reported hours because the employee could then 'evade a valid exemption' through 'his own substandard performance.' To 'steer clear of these two pitfalls' the court should consider 'the realistic requirements of the job.' Nonetheless, 'first and foremost' the court should consider 'how the employee actually spends his or her time.'

603 F. App'x 584, 586 (9th Cir. 2015) (citations omitted). Ms. Smith's claims of performing allegedly non-management tasks are not meaningful without the context required by the Office of Personnel Management regulations. But neither Ms. Smith nor any of the declarants have offered any evidence probative of the factors highlighted by the regulations.

Rather, Ms. Smith and the declarants make generic claims that management was not their "primary" duty and that her "primary duties" were "sanitation" and "operating the cash registers." Pl. Decl. ECF No. 25-3, ¶ 3; ECF 55-1 at 68-102. However, these statements are unhelpful to the analysis. They leave the relevant questions unanswered. For example, leaving aside the question of final authority, if management was not Ms. Smith's and the declarants' primary duty, who was responsible for operations at their individual canteen departments? Who prepared non-exempt staff's annual performance evaluations? Who prepared the work schedule? Who managed the budget? Who managed ordering and inventory? Who trained newly-hired employees? Who initiated discipline of employees? Who made the decision to hire employees? If an individual ACC did not have final authority, were their recommendations with respect to hiring or discipline given consideration and weight? Finally, despite claiming to have performed tasks that are the primary duty of non-management employees, did Ms. Smith and the declarants have the authority to delegate such duties? All of these management tasks are encompassed under the executive exemption. 5 C.F.R. § 541.10; *see also* Pay Administration Under the FLSA, 72 FR 52753-01; 52758.

Ms. Smith's performance evaluation and the declarations of non-plaintiff ACCs strongly suggest that the answers to these questions lead to the conclusion that Ms. Smith had authority over, or significant input into, most of these responsibilities.  Ms. Smith's Progress Review ECF No. 26, Ex. 11; Ex. 1 at 2, 9, 17; Ex. 2 at 40.  Further, as reflected in the non-plaintiff ACC declarations, each ACC had a different experience, with a unique combination of authority, or lack of authority, which would require an individualized, fact-intensive inquiry to resolve whether an individual ACC was subject to an unlawful *de facto* policy.

C.   In The Absence Of A Common "Illegal" Plan Or Policy, Ms. Smith's Proposed Collective Should Be Rejected

The Supreme Court has identified the main benefit of a collective action as twofold:  to give plaintiffs the advantage of lower individual costs to vindicate rights through the pooling of resource; and to allow for an efficient resolution in one proceeding of common issues of law and fact arising from the same alleged activity.  *Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 170 (1989).  The manageability of Ms. Smith's proposed collective, therefore, must be considered before determining whether notice should be sent to ACCs at canteens other than to the Palo Alto/Menlo Park, California canteen.  *See Valte*, 155 Fed. Cl. at 571  (a collective action cannot be managed "where trial does not lead to common answers to common questions"); *Servertson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266 (D. Minn. 1991) ("as matter of sound case management, a court should, before [authorizing notice] make a preliminary inquiry as to whether a manageable class exists.").  These considerations do not support authorizing notice in this case.

Trying this matter as a proposed nationwide collective action would not result in efficient resolution.  Rather, adjudication of the proposed collective action would require the Court to inquire into each plaintiff's day-to-day circumstances and his or her relationship to the CC to determine his or her exempt status, based on Ms. Smith's own theory that the local CC's management decisions create

unlawful policy.  Pl. Mot. at 12-14; *Smith*, 156 Fed. Cl. at 483 ("The idiosyncratic nature of ACC job

duties would require the Court to analyze the individual experiences of up to 600 employees at the

decertification stage.") *Sheffield v. Onus Corp.*, 211 F.R.D. 411, 413 (D. Ore. 2002) (denying certification

when "each claim would require extensive consideration of individualized issues" and "would be mired

in particularized determinations of liability and damages, rather than collective consideration of common

questions of law and fact").  In other words, Ms. Smith has not identified common issues of fact that

would apply to all potential plaintiffs in the proposed collective.  Further, Ms. Smith's testimony

contradicts that of other ACCs.  ECF 26, Exs. 2-10.  If the parties must establish a personal record

through cross-examination for each proposed claimant, based upon his or her perception of his/her role

contrasted with management's expectations, the case and the factual and legal issues raised simply cannot

be managed collectively.

  D. <u>Judicial Authority Does Not Support Ms. Smith's Request For A Collective Action</u>

    1. <u>*Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759 (N.D. Ohio 2015)</u>

  Ms. Smith has cited no legal authority to support her broad request for judicial intervention.

Relying on *Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759 (N.D. Ohio 2015), Ms. Smith contends that

in that case a nationwide collective was "based on the declarations of five plaintiffs who worked in three

different states, as well as job postings to demonstrate that plaintiffs and potential opt-in plaintiffs were

similarly situated.")  Pl. Mot. at 19.  However, the pertinent facts in *Waggoner* are vastly different the in

this case.  First, the plaintiffs in *Waggoner* alleged that their "primary duties" were to complete teller

transactions, wait on customers, walk the isles of the grocery store to promote defendant's products and

services, perform routine audits, and that these tasks were uniform in all corporate locations, and

retraining was not necessary when transferred to other corporate locations.  *Id.* at 768.  On the other hand,

Ms. Smith alleges that (1) she was responsible for *all* of the operations at the Palo Alto canteen, ECF 26,

Ex. 11 at 104; (2) each declarant, including Ms. Smith, alleges that management comprised at least ten

percent to thirty percent of their workday; and (3) *each canteen chief*, not the VCS central office, determined the day-to-day workload and delegation of management activities for *each individual ACC*. Thus, the *Waggoner* case fully supports *defendant's* explanation  that Ms. Smith's case should not be certified as a collective action because she has not made a modest showing that there was a *de facto* uniform policy that had ACCs performing non-management tasks as a primary duty.

### 2. Ms. Smith Reliance On Off-The-Clock Cases Does Not Support Conditional Certification Of A Collective

Ms. Smith's reliance on off-the-clock cases is misplaced because that theory of the case does not involve disavowing the job description, as Ms. Smith does.  Specifically, in off-the-clock claims, there may be a common policy that ties the plaintiffs together, for example, a policy to not pay for overtime for an alleged illegal reason.  *See Crosby*, 348 F.Supp. 3d at 748 (non-exempt employees were eligible for overtime and were being tasked with the performance of duties prior to and after clocking in and out of their shift.  Plaintiffs did not disavow the position description, which permitted the payment of overtime and were unified by common theories of defendant's statutory violation).  Thus, for judicial economy, courts grant conditional certification in order to efficiently adjudicate common statutory violations.  *Id.*

Ms. Smith's claim is unlike any off-the-clock matters because her theory of the case involves alleging that VCS's job description is lawful, but the manner in which it is implemented nationwide varies under the authority of individual CCs.  Pl. Compl. ECF No. 1 ¶ 22-24; Pl. Mot. at 12-14.  Thus, Ms. Smith admits that there is not a "common nationwide policy" that ties together ACCs as a "similarly situated" group, and whether VCS improperly classified ACCs would require a plaintiff-by-plaintiff inquiry because she alleges that individual CCs are responsible for violating the FLSA; not the VCS as a whole or its central management staff.  *Id.*; *See [Case name],* 145 Fed. Cl. 446, 451 (2019) (generally, courts do not infer that individuals at one location are similarly situated to individuals elsewhere without

specific evidence of consistency.)  Consequently, Ms. Smith's reliance on off-the-clock cases does not

support her request for conditional certification.

### 3.  Ms. Smith's Reliance On Misclassification Cases Is Misplaced Because She And The Declarants Have Dissimilar Experiences And Exercise Significant Management Authority

(a)  *Pendlebury v. Starbucks Coffee Co.,* 2005 WL 84500 (S.D. Fla. Jan. 3, 2005)

The court in *Pendlebury* granted conditional certification because plaintiffs alleged (1) that their

management duties were relatively unimportant in comparison with the performance of non-management

tasks; (2) they rarely exercised discretionary authority; and (3) they did not customarily and regularly

supervise two or more full-time employees.  Pl. Mot. at 19; *Pendlebury*, 2005 WL 84500 *1 (S.D. Fla.

Jan. 3, 2005).  Ms. Smith's own performance evaluation discusses her management of the *entire* food and

retail departments in the Palo Alto canteen before managing the Menlo Park canteen.  Pl. Performance

Review ECF No. 26, Ex. 11 at 103-104.  Undoubtably, Ms. Smith had important management duties,

routinely exercised discretionary authority, and supervised staff.  *Id.*  Many of the declarants had a similar

experience.  Specifically, each declarant spends between 10 percent and 30 percent of the daily tasking

exercising discretionary management authority.  ECF 55-1 at 68-102.  Further, in the case of declarants

Cannary, Webb, McCague, and Davis, they managed operational concepts, ECF No. 55-1, at 97-98;

participated in national call meetings, ECF 55-1 at 93; had a management role in the hiring of employees

who perform non-managerial functions as a primary duty, ECF 55-1 at 73; were responsible for training

on food safety/sanitization, assisting with the design of floorplans and supervising non-exempt

employees, *Id.* at 97-98, ¶¶ 4, 8; trained teams on food safety/sanitation and assists with the change of

canteen layout, and oversaw the mitigation of economic losses, Ex. 1 at DOJ002, DOJ010, DOJ016; and

built employment teams, Ex. DOJ039-DOJ040.  Thus, Ms. Smith's reliance on *Pendlebury* is misplaced.

(b)  *Meyer v. Panera Bread Co.,* 344 F. Supp. 3d 193, 201 (D.D.C. 2018)

Likewise, *Meyer* is unhelpful to Ms. Smith's cause because although it is a misclassification case, the corporate headquarters exerted significant control over the operations of the restaurant. *Meyer*, 344 F. Supp. 3d at 203. That is not the case with VCS canteens, where the CC exercised significant control over the operations of the canteen. Pl. Mot. at 12-14; Tober Decl. 95:24-96:6 (the CC is responsible for all aspects of the canteen and any failure to properly manage the canteen may result in a demotion due to unproductivity.) Next, the plaintiffs in *Meyer* linked the performance of non-management duties to a corporate policy of strictly controlling labor costs. *Id.* Neither Ms. Smith nor the declarants have linked any kind of national policy with a reason why they allege that they perform non-management tasks as a primary duty. *See* Pl. Compl., ECF No. 1, *generally*; Pl. Motion, *generally*.

Finally, in *Meyer*, the company converted the assistant manager position from exempt to non-exempt, which could lead to a finding that when the assistant manager position was exempt, its primary duties were non-managerial in nature. In this case, the ACC position has not been classified as non-exempt in three years preceding the filing of Ms. Smith's complaint, the position requires ACCs to perform managerial tasks as a primary duty, and the position description fits squarely within the FLSA's executive exemption. Thus, *Meyer*, does not assist Ms. Smith with establishing a collective of ACCs.

(c)   *Stevens v. HMSHost Corp.*, No. 10-cv-3571, 2012 WL 13098466, at *3 (E.D.N.Y. 2012)

Similar to *Meyers*, *Stevens* is a misclassification case, but it does not assist Ms. Smith with establishing a collective because the plaintiffs in *Stevens* stated that, in addition to performing non-management tasks for a majority of their workday, none of them had the authority to train, to hire, to discipline or to promote employees. *Stevens*, No. 10-cv-3571, 2012 WL 13098466, at *3 (E.D.N.Y. 2012). In this case,, declarants Cannary, Webb, McCague, and Davis, along with defendant's declarants, acknowledge that they have the authority to train, to hire, to discipline or to promote employees. ECF No. 55-1 at 73, 93, 97-98; Ex. 1 DOJ002, DOJ010, DOJ016; Ex. 2 DOJ039-DOJ040. Additionally, Ms.

42

Smith was responsible for resolving conflicts (for example, discipline) with subordinate employees. ECF No. 26, Ex. 11 at 104. Accordingly, *Stevens* does not assist the Court with determining whether Ms. Smith has made the requisite showing required to certify a collective of ACCs.

>    4.  Denial Of Overtime Pay Does Not Qualify As Support For A Nationwide Collective Action Because Ms. Smith Fails to Provide Any Evidence Of The Existence Of A Nationwide Policy Affecting All Members Of The Collective

Ms. Smith argues that by simply alleging that she was denied overtime pay due to an alleged misclassification is enough to demonstrate that there was a common policy for purposes of conditional certification. She cites *Barry v. United States*, 117 Fed. Cl. 518, 522 (2014), and *Doe No. 1 v. United States*, 143 Fed. Cl. 113, 116 (2019), as authority. Pl. Mot. at 17. Ms. Smith is not correct. Numerous courts have concluded that "[g]enerally, to certify a nationwide collective action in an FLSA exemption case, a plaintiff must ultimately demonstrate a nationwide policy pursuant to which managers are assigned duties that render the employer's exempt classification inappropriate." *Mason v. Lumber Liquidators, Inc.*, No. 17-cv-4780 (MKB) (RLM), 2019 WL 2088609, at *8 (E.D.N.Y. May 13, 2019) (internal quotation, citations, and alterations omitted); *see also Korenblum*, 195 F. Supp. 3d at 480 ("potential members [of a collective action] must be similarly situated with respect to the allegedly unlawful policy or practice." (citation omitted)). "[T]he mere classification of a group of employees— even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Brown v. Barnes & Noble, Inc.* ("*Brown I*"), 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) (collecting cases); *see also McDermott v. Fed. Sav. Bank*, 14-cv-6657 (JMA) (GRB) 2018 WL 1865916, at *4 (E.D.N.Y. Apr. 18, 2018) (finding that plaintiffs "failed to identify any such policy other than their classification as exempt, which is insufficient to show that they are similarly situated" (citing *Brown I*, 252 F.Supp. 3d at 262)).

Thus, when determining whether a named plaintiff is similarly situated to any potetntial plaintiff "courts generally require 'that there be a factual nexus between the claims of the named plaintiff and those who have chosen or might potentially choose to opt into [join] the action.'" *Jibowu v. Target Corp.*, 492 F. Supp. 3d at 122 (citations omitted).  Ms. Smith has not done that.  Therefore, Ms. Smith's argument that simply alleging that she served as an ACC, ACCs are FLSA-Exempt, and were misclassified as exempt, and thus are similarly situated because of that fact, is misplaced.

## II.    THE FORMS OF NOTICE AND CONSENT PROPOSED BY PLAINTIFF IS IMPROPER AND INADEQUATE

For the reasons stated above, conditional certification of a collective is *not* appropriate.  If, however, the Court were inclined to grant conditional certification, Ms. Smith's proposed nationwide class of ACCs is inappropriate because the proposed methodology for facilitating notice and request for confidential information about potential class members is improper, unnecessary and overreaching.

### A.   Notice Should Be Limited To The Menlo Park And Palo Alto Canteens

Ms. Smith argues that ACCs are subject to an illegal *de facto* exemption policy.  However, as discussed above, the policy is facially lawful, and as evidenced by the ACC job summaries, VCS expects that ACCs to be engaged primarily in managerial tasks.  ACC PD, ECF No. 25-1, Ex. at 99-102.  Ms. Smith offers her declaration testimony that, despite her job description, the bulk of her time was devoted to non-managerial work.  However, her declaration reflects only her personal experience in one Canteen with two locations, and her experience cannot be imputed to other ACCs at other Canteens, particularly those in other regions of the country.  *See, Heitzenrater v. Officemax, Inc.,* No. 12-cv-900S, 2014 WL448502, at *6 (W.D.N.Y. Feb. 4, 2014).

Although Ms. Smith contends that unnamed ACCs at other canteen locations had similar experiences and presents 12 declarations, that evidence does not establish that those ACCs in other Canteens operated under an alleged illegal nationwide *de facto* policy.  As Ms. Smith and the declarants

admit in their declarations, their employment experiences are merely anecdotal and individualized situations at individual canteens where the CC directed each ACC's activities with no specific support for the allegations of a violation, having not provided any names or dates of an alleged FLSA violation.  Pl. Mot. at 12-14; ECF 55-1 at 69-102.  Thus, there is no common policy to tie the proposed collective together.  *See Eng-Hatcher v. Sprint Nextel, Corp.*, 07-cv-7350 (BSJ)2009 U.S. Dist. LEXIS 127262, at *13 n.5 (S.D.N.Y. Nov. 13, 2009) (discounting "general statements" to support claim that other employees are similarly situated to the plaintiff).

A court may also limit collective size when it has concerns about manageability or judicial efficiency.  Ms. Smith's theory of liability is premised on her contention that her CC, and the CCs that supervised the declarants, deviated from VCS's written expectation that ACC's perform managerial tasks as their primary duty.  As a result, a collective action would necessarily involve individualized inquiries into each ACC's daily work activities as compared to VCS's written expectations.  This would not promote judicial efficiency and, in fact, would undermine the very purpose of a collective action. *Hoffman-LaRoche*, 493 U.S. at 170 (requirement that proposed class members be "similarly situated" ensures the "efficient resolution of common issues of law and fact").

B.  Ms. Smith's Request For Information Other Than Potential Collective Members' Last
    Known Addresses Is Overbroad And Unnecessary

Ms. Smith requests that VCS produce "names, last known addresses, and job titles" of all potential plaintiffs employed at VCS anywhere in the United States at anytime within the applicable time frame.  Pl. Mot. at 22-23.  Ms. Smith's request is premature and overbroad because the Court has not certified a nationwide collective. S*ee Valte,* 155 Fed. Cl. at 576 (the court declined to provide notice "[b]ecause the evidence does not show that [p]laintiffs are similarly situated to the individuals who would receive notice under [p]laintiffs' proposal, it does not appear that notice to the individuals would advance the case.); *Hoffmann–La Roche*, 493  U.S. at 170 (a court must be satisfied that conditionally certifying a

nationwide collective action, or even a regional collective action, will partake of the economy of scale envisioned by the FLSA collective action procedure)

III.     EQUITABLE TOLLING DOES NOT APPLY

    A.     Equitable Tolling Is Unavailable In FLSA Claims Against The Government

Contrary to plaintiffs' assertion, the FLSA's statute of limitations cannot be equitably tolled in cases against the United States. *See* Pl. Mot. at 19-22. When enacting the FLSA, Congress provided a two-year statute of limitations within which aggrieved employees may sue their employers, or a three-year limitations period for willful violations.  29 U.S.C. § 255(a). An action is commenced under section 255 on the date of filing, in the case of a named plaintiff, or otherwise on the date upon which an individua l files with the court his or her written consent to join. *Id.* at § 256. When originally enacted, the FLSA did not apply to the United States.  Congress later extended the provisions of the FLSA to the United States. *Adams v. UnitedStates*, 141 Fed. Cl. 428, 431 (2019) (citing 29 U.S.C. § 213(a)).

In *Soriano v. United States*, 352 U.S. 270 (1957), the Supreme Court reiterated that "this Court has long decided that limitation and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." 352 U.S. at 276 (citing *United States v. Sherwood*, 312 U.S. 584, 590-91 (1941)). As to the United States, the FLSA statute of limitations is an element of the waiver of sovereign immunity provided when Congress extended the FLSA to the United States. The statute of limitations, therefore, cannot

be tolled as against the United States.

Neither the Court of Appeals for the Federal Circuit, nor the Supreme Court have equitably tolled the two-year statute of limitations in FLSA cases. This Court has "acknowledged that the issue of whether equitable tolling is generally permitted under the FLSA has not been resolved by either the Supreme Court or the U.S. Court of Appeals for the Federal Circuit." *Jones v. United States*, 88 Fed. Cl. 789, 791 (2009). However, this Court's predecessor, the United States Claims Court, addressed the availability of

equitable tolling in FLSA cases in *Doyle v. United States*, 20 Cl. Ct. 495, 499-500 (1990), *aff'd*, 931 F.2d

1546 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 1029 (1992), holding that equitable tolling is unavailable for

alleged willful violations of the FLSA because Congress has already provided an extension of

the limitations period for those violations. *Id.; see* 29 U.S.C. § 255 (willful violations are subject to a

three-year statute of limitations). That is exactly the relief Ms. Smith seeks. *See* Pl. Mot. at 19-22.

(requesting equitable tolling); *id.* ¶¶ 90, 199 (contending that the alleged FLSA violation was willful).

Although there is a presumption that equitable tolling applies to statutes of limitations, that

presumption may be rebutted. *John R. Sand & Gravel Co.*, 552 U.S. 130, 137 (2008). "Specific statutory

language, for example, can rebut the presumption by demonstrating Congress' intent to the contrary." *Id.*

at 137-38. And this would appear to apply regardless of whether the FLSA might be classified as

"jurisdictional." The Supreme Court has set forth various factors that, if present, indicate that Congress

intended that equitable tolling should not apply. *United States v. Brockamp*, 519 U.S. 347, 350-52 (1997).

As the Federal Circuit has held, not all of these factors need be present, and even the presence of one

factor can be dispositive when determining whether tolling is available. *Kirkendall v. Dep't of Army*, 479

F.3d 830, 837 (Fed. Cir. 2007). (citations omitted). Those factors include whether the statute of limitations

is repeated in the statute, whether it is stated in an "unusually emphatic" form, and whether the statute of

limitations already includes explicit exceptions. *See Brockamp*, 519 U.S. at 350-52. All three of these

factors indicating against equitable tolling are present in this case.

First, the limitations period is repeated in section 255(a). *See* 29 U.S.C. § 255(a) (action "may be

commenced within two years after the cause of action accrued," and "every such action shall be . . .

commenced within two years after the cause of action accrued"). Second, the limitations period is stated

in an unusually emphatic form. *Id.* ("every such action *shall be forever barred* unless commenced

within two years after the cause of action accrued." (emphasis added)).

47

Third, the FLSA sets forth an explicit exception to the general two-year rule: "every such action shall be forever barred unless commenced within two years after the cause of action accrued, *except that* a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *Id*. (emphasis added). Because section 255 "sets forth explicit exceptions to its basic time limits, and those very specific exceptions do not include 'equitable tolling,'" tolling would be inconsistent with the intent of Congress that tolling not be permitted. *Brockamp*, 519 U.S. at 351-52; *see also Brice v. Sec'y of the Dep't of Health and Human Servs*., 240 F.3d 1367, 1373 (Fed. Cir. 2001) ("When an Act includes specific exceptions to a limitations period, we are not inclined to create other exceptions not specified by Congress."); *Doyle*, 20 Cl. Ct. at 499-500 (holding that equitable tolling does not apply to FLSA statute of limitations, in part, because of the exception for a willful violation). Thus, the FLSA's statute of limitations may not be equitably tolled for claims against the Government.

### B. Even If Equitable Tolling Could Apply, It Would Not Be Available For Ms. Smith's FLSA Claim

Regardless, equitable tolling is not available for Ms. Smith's FLSA claim because there is no evidence that she (1) filed a defective pleading during the statutory period; (2) was induced or tricked by defendant's misconduct into allowing the filing deadline to pass; or (3) her injury was "inherently unknowable." *Smith*, 156 Fed. Cl. at 478; *see Martin v. United States*, No. 13-CV-834C (PSC), 2015 WL 12791601, at *3 (Fed. Cl. Oct. 15, 2015) (quoting *Christofferson v. United States*, 64 Fed. Cl. 316, 326 (2005). Additionally, the equitable tolling of the statute of limitations should be applied "sparingly." *Crawley*, 145 Fed. Cl. at 451.

As with Ms. Smith's first motion, she does not contend that there was a defective pleading filed during the statutory period, nor does she argue that her injury was "inherently unknowable." Pl. Mot. at 19-22. Instead, it appears that Ms. Smith seeks equitable tolling based on the Court's April 5, 2022 order striking the inclusion of 12 opt-in plaintiffs into the conditionally certified action that is limited to the

48

Menlo Park/Palo Alto facility.  *Id.*  However, none of Ms. Smith's arguments are persuasive as defendant has not made an affirmative misrepresentation or otherwise committed any other affirmative misconduct that resulted in lulling Ms. Smith into inaction.  Accordingly, Ms. Smith's request for equitable tolling of the statute should be denied.  Moreover, Ms. Smith is seeking equitable tolling for non-parties, that is, potential plaintiffs.  Because they are not parties to this action, they cannot request and advisory opinion from the Court as to whether, if they were to join this action, their claims would be subject to equitable tolling of the applicable statute of limitations.

IV.   **THE COURT CORRECTLY STRUCK MS. SMITH'S FILING OF NOTICES OF CONSENT TO JOIN FOR POTENTIAL PLAINTIFFS**

Although certification is not required for potential plaintiffs to join a case, it is an essential case management tool that permits the Court to manage a large volume of plaintiffs that allege a violation of a common policy.  Ms. Smith's attempt to join additional plaintiffs into a conditionally certified case that is the Court had limited to the Menlo Park/Palo Alto, California canteen, is an end-run on the entire conditional certification process and contrary to the two-step approach.  Ms. Smith cites *Gonyer v. Vane Line Bunkering, Inc.,* 32 F. Supp. 3d 514, 516-17 (S.D.N.Y. 2014), for the proposition that "a motion for conditional certification need *not* be pending for a plaintiff to opt-in."  32 F. Supp. 3d 514, 516-17 (S.D.N.Y. 2014).  However, *Gonyer* did not contain a strict court order that barred other plaintiffs from joining the case.  In this matter, the Court issued a notice that prohibited the inclusion of additional plaintiffs that were not employed at the Menlo Park/Palo Alto canteen for  three years preceding the filing of the complaint.  Court Approved Notice (Notice), ECF No. 35; *Hoffman-LaRoche,* 493 U.S. at 171 (trial courts have wide discretion to manage collective actions.)  Therefore, except for Richard Bartoni, none of the other declarants were employed at the Menlo Park/Palo Alto canteen during the three years preceding the filing of Ms. Smith's complaint.  Accordingly, in accordance with its prior Order, the Court correctly struck the notices of consent forms.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiff's motion for nationwide conditional certification and issuance of nationwide notice. We do not oppose conditional certification of a collective action including anyone who worked as an ACC at the Palo Alto and Menlo Park Canteens, located in Palo Alto and Menlo Park, California within three years prior to the date of filing an appropriate consent to join form. We oppose providing names, last known addresses, and job titles for all ACCs that were employed nationwide for three years preceding the filing of Ms. Smith's complaint on September 4, 2019. Finally, we oppose any tolling of the statute of limitations because tolling is not available and, if it were, Ms. Smith fails to satisfy the required tolling criteria.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY.
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

/s/ Rafique O. Anderson
RAFIQUE O. ANDERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-3274
Fax: (202) 514-7965
Rafique.Anderson@usdoj.gov

July 29, 2022

*Attorneys for Defendant*

50